**Opinion filed February 5, 2009**



In The

# Eleventh Court of Appeals

---

### No. 11-06-00146-CR

---

**OSCAR PENA DE LA PAZ, Appellant**

**V.**

**STATE OF TEXAS, Appellee**

---

**On Appeal from the 32nd District Court**

**Nolan County, Texas**

**Trial Court Cause No. 10194-B**

---

## O P I N I O N  O N  R E M A N D

Oscar Pena De La Paz[1] was convicted of two counts of aggravated sexual assault and one count of injury to a child, was sentenced to seventy-five years confinement for each of the aggravated sexual assault counts and twenty years confinement for the injury to a child count, and fined $10,000 for each count. We affirmed his conviction. *Delapaz v. State*, 229 S.W.3d 795 (Tex. App.—Eastland 2007). The Court of Criminal Appeals reversed, finding that the State failed to carry its burden of proof to admit hospital records containing statements made by the victim to a nurse and

---

[1]Appellant's name is spelled differently in the indictment, the judgment, the notice of appeal, and throughout other places in the record. We point out that we have spelled appellant's name, "De La Paz," because that is the way the Court of Criminal Appeals has spelled it in its opinion in this case.

social worker, and remanded to this court for a harm analysis. *De La Paz v. State*, No. PD-1168-07, 2008 WL 2437648 (Tex. Crim. App. June 18, 2008). Finding no harm, we affirm.

## I. *Background Facts*

Angie Medina and De La Paz lived together and had five children, including seven-year-old K.D. One afternoon, Medina went shopping with her mother and niece and left De La Paz with the children. When she returned home, the kids were playing outside, and De La Paz was inside with the door locked. K.D.'s demeanor was conspicuous. She was quiet and did not want to talk. De La Paz unlocked the door for Medina, and when she went inside, he told her that he had given the kids a bath. She thought this was odd because he had never bathed the girls before – even though she had asked him to – and because he put their same clothes back on. She started to put clean clothes on the children, but De La Paz told her to wait. He asked her what would happen if one of their daughters was molested. De La Paz then told Medina that K.D. was bleeding from her "middle spot."

De La Paz had blood on his fingers, and K.D. had bloodstained toilet paper in her vagina. He did not want Medina to take K.D. to the hospital because he was concerned that the police and CPS would become involved and would take their children away, but Medina took K.D. to the Sweetwater hospital's emergency room anyway. Medina called De La Paz from the hospital to update him on K.D.'s condition. He then told her that K.D. had complained about a black boy injuring her. De La Paz also put K.D.'s sister on the phone. In the background, he could be heard telling her to say that K.D. injured herself when she fell out of a tree.

Sweetwater law enforcement officials were contacted. They interviewed Medina at the hospital. She consented to a search of her apartment. When the police arrived, De La Paz and two children were present. De La Paz told the officers that K.D. had been injured while playing outside and that she had come into the apartment bleeding. The officers found no sign of any blood dripping on the front or back porches, on the tile floor, on the furniture, or on the doorknobs. They did find damp, bloodstained clothing in the bathroom, bloodstains on the toilet seat, and bloodstained toilet paper in a trash can. De La Paz also told the officers that he had tried to clean K.D. The bathtub, however, was dry, and it had dried sand in the bottom. The police asked De La Paz to come to the

police station for an interview. He complied and provided them with a written statement in which he blamed K.D.'s injuries on an unknown black boy.

Meanwhile, K.D. was transferred to Hendrick Medical Center for further treatment. She was diagnosed with a second degree laceration that went approximately one inch into her vagina and required surgical intervention to repair. Hospital personnel suspected sexual abuse. Pat Rollins, a Sexual Assault Nurse Examiner from Hendrick Medical Center, testified that she was unable to obtain a history from K.D. because her injury was life-threatening. When Rollins attempted to talk to K.D., she would "clam right up and get real scared." Rollins described K.D.'s injury as what you would expect to find in a person who had delivered a baby, that it was "clear evidence of blunt force trauma or penetration," and that it was not consistent with a fall. Dr. Michelle Johnson, a gynecologist, treated K.D. She testified that K.D.'s injuries were consistent with penetration by an adult penis and were probably not caused by a fall.

Two days after her surgery, K.D. told a hospital social worker and a hospital nurse that her father had injured her. De La Paz was subsequently arrested. He gave a second statement in jail. This time, he claimed that he accidentally cut K.D. while bathing her. He stated that K.D. was jumping around in the tub and that he "reached down by her legs and pulled her hard. I did not have this planned. I didn't plan to go to her private. I guess that is when I cut her open." De La Paz contended that he was scared and that he tried to clean up the blood.

At trial, De La Paz testified that he bathed the kids while Medina was shopping. He put their same clothes back on to avoid having to search for clean clothes. After Medina returned home, he heard a knock. He went to the door and saw K.D. She had blood on her fingers and told him that she was bleeding. He discovered that she was bleeding from her vagina. He and Medina tried to clean up the blood with toilet paper. When the bleeding persisted, Medina told him that she was taking K.D. to the doctor. De La Paz denied trying to discourage her from doing so.

De La Paz testified that his first written statement was true. He testified that the second statement was not. De La Paz claimed he was pressured into admitting that he had poked K.D. with his fingers in exchange for a promise of community supervision. The State confronted De La Paz with inconsistencies between his first written statement and his trial testimony, such as what he was

3

doing when K.D. knocked on the door. He blamed these on Medina, claiming that she asked him to lie.

## II. *Issues on Remand*

De La Paz argues that he was harmed by the admission of K.D.'s medical records and that he received ineffective assistance of counsel because counsel did not object to inadmissible evidence.

## III. *Analysis*

### A. The Erroneously Admitted Evidence.

The State offered medical records from Hendrick Medical Center and Rolling Plains Memorial Hospital that were filed under affidavit. These records included notes from Melissa Foss, a social worker employed by Hendrick, and Casey Wasson, a Hendrick nurse. Foss interviewed K.D. in her hospital room and asked what happened. K.D. told Foss that her dad had poked her with his "pee-pee" and with his fingers. Foss asked K.D. if he had done this before, and K.D. responded, "A lot." Foss asked if her father did this to any of her brothers or sisters, and K.D. shook her head and said, "[J]ust me." Foss asked Wasson to come into K.D.'s room, and K.D. repeated her accusation. Foss and Wasson made separate notes of their conversation with K.D. and included them in K.D.'s medical records.

De La Paz objected to Foss's and Wasson's notes, contending that their admission violated his confrontation clause rights.[2] The trial court sustained the objection in part. The trial court allowed the State to introduce records containing Foss's and Wasson's questions and K.D.'s responses but ordered the State to redact any other third party statement. On appeal, De La Paz contended that this was error because he was not allowed to cross-examine either Foss or Wasson.[3] We held that the trial court did not err because Foss's and Wasson's notes were not testimonial statements. *Delapaz*, 229 S.W.3d at 799. The Texas Court of Criminal Appeals reversed, holding that the State had failed to carry its burden to establish that the records were admissible. 2008 WL 2437648 at *8.

---

[2]U.S. CONST. amend. VI.

[3]De La Paz's brief referred to his inability to cross-examine K.D., but we found that this point was not preserved because it was neither raised in the trial court nor briefed in our court. *Delapaz*, 229 S.W.3d at 798 n.2.

4

*B. Standard of Review.*

The violation of a defendant's right of confrontation is subject to a harmless-error analysis. *Delaware v. Van Arsdall*, 475 U.S. 673 (1986). We must reverse the conviction unless we determine beyond a reasonable doubt that the error did not contribute to it. TEX. R. APP. P. 44.2(a). The emphasis of a harm analysis is not the propriety of the trial's outcome but the integrity of the process that led to the conviction. *Harris v. State*, 790 S.W.2d 568, 587 (Tex. Crim. App. 1989). The question is not whether the jury verdict was supported by the evidence. The question is the likelihood that the constitutional error was actually a contributing factor in the jury's deliberations in arriving at a verdict. *Wells v. State*, 241 S.W.3d 172, 177 (Tex. App.—Eastland 2007, pet. ref'd).

Courts have identified several factors to consider in this instance: (1) how important was the statement to the State's case; (2) whether the statement was cumulative of other evidence; (3) the presence or absence of evidence corroborating or contradicting the statement on material points; and (4) the overall strength of the State's case. *Scott v. State*, 227 S.W.3d 670, 690 (Tex. Crim. App. 2007). We may also consider the source and nature of the error, the amount of emphasis by the State on the statement, and the weight that a juror would probably give it. *Id.* Finally, we presume that the damaging potential of any cross-examination would have been fully realized had the witness been present to testify. *Baldree v. State*, 248 S.W.3d 224, 231 (Tex. App.—Houston [1st Dist.] 2007, pet. ref'd).

*C. Did the Notes Contribute to De La Paz's Conviction?*

*1. The State's Case Without the Notes.*

K.D. suffered a second degree laceration to her vagina while she was in De La Paz's care that was consistent with penetration by an adult penis. De La Paz had blood on his hands; he acted suspiciously; he discouraged Medina from changing K.D.'s clothes even though he had just bathed her; he discouraged Medina from taking K.D. to the hospital; he encouraged his other daughter to tell Medina that K.D. injured herself when she fell; he provided two inconsistent statements prior to trial; and his trial testimony was in some respects at odds with both of these. The physical evidence was inconsistent with both written statements and his trial testimony. Except for De La Paz's claim that an unknown black boy injured K.D., there was no other evidence implicating anyone else. This evidence is sufficient to sustain his conviction.

5

*2. The Erroneously Admitted Evidence.*

After the State called its last witness, it read the following hospital record excerpts:

Reviewed chart and spoke with charge nurse regarding admit dx of vaginal laceration and alleged sexual assault. Went to room to talk with patient. Mom present in room. Asked mom to talk with patient for a few minutes in private. Mom went to family room. Began conversation with patient talking about school and she told me all about her school, teacher and friends. I then asked patient about what happened on Saturday before she came to the hospital. She stated, "I bleeding and daddy gave me a bath." When asked why she was bleeding, she stated that "Daddy poked me." When asked what she was poked with, patient stated "his fingers."

I then asked patient, "Did daddy poke you with anything else?" Patient stated "with his pee-pee." I then asked patient, "Has he done this to you before?" Patient shook head yes and looked at the floor. I asked, "Has he done this one time, two times, or a lot of times?" Patient replied "a lot." I asked patient if her dad also did this to her brothers and sisters? Patient shook her head no and stated, "just me."

I called out to the nurses station for charge – I called out to the nurses station for Charge Nurse C. Wasson, RN, to be a witness.

Casey asked patient, "Can you tell me what happened?" Patient looked at the floor and stated, "Daddy poked me with his pee-pee." I asked patient, "What else?" And patient stated, "His fingers." I asked patient, "Where was your mom?" Patient stated, "At the store." Casey left room and I told patient I needed to make some phone calls and would check on her later. Met with mom to discuss conversation with patient. Asked mom if patient had told her what had happened. Mom shook her head yes and told me how her husband acted very funny when she got home from the grocery store. Dad bathed patient which he never does, per mom, and was not concerned with the amount of blood loss. Told mom to wait until Monday to take to the doctor. Mom decided to go ahead and take patient to hospital because six-year old daughter told her something bad happened to patient.

. . . .

Called to patient room by M. Foss, LSW. Mom outside room. M. Foss, LSW asked patient, "Can you tell Ms. Casey what you just told me?" I asked patient, "Can you tell me what happened?" The patient looked down at a pen she was holding and stated, "My daddy poked me." When asked by myself, "With what?" Patient still looking down stated, "With his pee-pee." M. Foss, LSW asked, "And what else? Was there anything else?" Patient stated, "His fingers." And then I left the room.

6

Mom called out stating patient wanted to speak to us.  L. Calvert, RN and myself in at bedside.  Patient up in bed coloring.  Patient states, "I saw blood."  I asked, "Where did you see the blood?"  Patient states, "In the toilet."  L. Calvert asked, "Where else?"  Patient states, "In the bathtub."  L. Calvert asked, "Did you take a bath before or after you saw the blood?"  Patient states, "after."  L. Calvert asked, "Do you know how the blood got there?"  Patient states, "no" and nods her head.

### 3. The Importance of the Medical Notes.

The State made only a passing reference to the notes in its opening and did not ask any witness about them during its case.  It did read them to the jury after calling its last witness, and it asked De La Paz during cross-examination about K.D.'s accusations.  But the State started its closing argument by describing the notes as "the most important evidence that you have heard in this case."  The State reread K.D.'s statement that she was bleeding because her daddy poked her with his "pee-pee" and fingers and spent the balance of its closing summarizing the evidence and arguing that it supported this statement.  The notes were, therefore, important to the State's case.

### 4. Whether the Notes were Cumulative.

The notes were not cumulative of other evidence.  K.D. did not testify; no other witness testified that K.D. blamed De La Paz for her injuries; and in fact, Medina and Rollins both testified that K.D. would not say what had happened. Finally, there was no other evidence that K.D. was assaulted more than once.

### 5. The Presence or Absence of Corroboration or Contradiction.

The notes were corroborated.  The medical evidence established that K.D.'s injury was caused by blunt force trauma or penetration, that it occurred while she was in De La Paz's care, and that K.D.'s injury was consistent with penetration by an adult penis but not consistent with a fall.  Medina and De La Paz corroborated K.D.'s description of being left alone with him while Medina went shopping.  De La Paz was the only adult male in the apartment at the time, he had blood on his fingers, and he acted suspiciously.  The only contradictory evidence was De La Paz's denial.

### 6. The Strength of the State's Case.

The State's case was strong.  As noted, medical evidence – excluding the notes – indicated that K.D. had been recently sexually assaulted. De La Paz was directly implicated by his presence

and behavior. There was no evidence that K.D. was with any other adult at the time, and De La Paz's credibility was questionable at best.

### 7. *The Effect of Impeaching the Absent Witnesses.*

There is nothing in the record to establish what impeachment evidence De La Paz would have offered if either Wasson or Foss had testified. De La Paz suggests that cross-examination might have established evidence of coaching and that cross-examination might have developed evidence of K.D.'s state of mind or demeanor. The record does not indicate that either area of inquiry would have been fruitful.

The State filed a motion to determine K.D.'s unavailability as a witness, and the trial court conducted an evidentiary hearing. The State called Leann Hicks, a counselor, as a witness. At the time of the hearing, she had counseled with K.D. for four and one-half months. Hicks testified that K.D. was extremely shy and withdrawn and that having to testify in front of her father would cause emotional harm. She described K.D. as delayed academically, cognitively, socially, and emotionally and testified that K.D. has no concept of time. Hicks stated that K.D. could describe what had happened to her and that she understood the difference between the truth and a lie. Hicks also testified that K.D. told her that De La Paz had abused her since she was six years old. De La Paz's cross-examination primarily addressed Hicks's qualifications as an expert and her testimony about the harm K.D. would suffer if forced to testify. Nothing in that examination supports any inference that K.D. was coached to implicate her father or that her ability to perceive and relate events was impacted by her state of mind or demeanor.

De La Paz filed a motion to suppress K.D.'s videotaped statement, and the trial court held a second evidentiary hearing. The State called Peggy Parrott as a witness. Parrott was a child interviewer at the Advocacy Center, and she interviewed K.D. That interview was recorded, and De La Paz's motion sought to suppress it. De La Paz's cross-examination primarily addressed Parrott's compensation by the district attorney's office. Nothing in that examination supports an inference that K.D. was coached or that her state of mind or demeanor impacted her ability to recall and relate events.[4]

---

[4]The trial court denied the motion to suppress, but the State did not introduce the interview into evidence at trial.

We have previously noted that De La Paz did not brief, and therefore did not preserve, whether he was improperly denied the opportunity to cross-examine K.D. However, even if we consider this, the record does not support any inference that her cross-examination would have negatively impacted the State's case. K.D. implicated her father to Foss and Wasson at the hospital, during her interview with Parrott, and during her counseling sessions with Hicks. K.D.'s contention was consistent each time. De La Paz contended that K.D. had lied previously and that this led to a CPS investigation, but that evidence came in without cross-examining her.

We are satisfied beyond a reasonable doubt that the notes did not contribute to De La Paz's conviction. The strength of the State's case, De La Paz's behavior the day of the event, and his questionable credibility satisfy us that the notes did not move the jury from a state of unpersuasion to a state of persuasion. *See Davis v. State*, 203 S.W.3d 845, 853 (Tex. Crim. App. 2006).

*D. Did the Notes Contribute to De La Paz's Punishment?*

De La Paz next argues that the notes harmed him during the punishment phase of the trial because they are the only evidence that he penetrated K.D. on multiple occasions. De La Paz reasons that whether it occurred once or on multiple occasions would be extremely significant. Because the seventy-five-year sentences are near the top of the allowable punishment range for aggravated sexual assault and the twenty-year sentence is the maximum permissible punishment for injury to a child, the notes clearly impacted the jury's punishment determination.

The State introduced no other direct evidence during the guilt/innocence phase of trial that De La Paz abused K.D. on any other occasion although there was evidence of prior problems. Medina and De La Paz both acknowledged that they had been previously investigated by CPS. The State called Hicks as its sole witness during the punishment phase of the trial. She described the effect this incident has had and will continue to have on K.D. She echoed a portion of the hospital notes by testifying that, when she asked K.D. why she was in counseling, K.D. responded that it was because her daddy poked her with his finger and "pee-pee." Hicks did not, however, repeat her pretrial testimony that K.D. claimed her father had abused her since she was six or otherwise suggest that De La Paz abused K.D. more than on this one occasion.

During its initial closing argument, the State made no reference to the medical notes or to K.D.'s statement that De La Paz abused her more than once. Instead, the State referred only to the

9

single episode giving rise to K.D.'s hospitalization and asked the jury to consider its impact on her. The State also asked the jury to consider De La Paz's prior conviction for burglary of a building, his admission that he slapped Medina around the week before this incident, and his inconsistent statements he gave police. During final summation, the State reminded the jury that it had heard from K.D. through the medical records but did not make any reference to anything in those records.

We are convinced beyond a reasonable doubt that the notes did not contribute to De La Paz's punishment. The jury's punishment assessment is severe, but De La Paz's prior criminal record, his admitted act of spousal abuse, the harm he caused K.D., his refusal to accept responsibility, and his attempt to cover up the incident are more than sufficient to explain the jury's decision. That conclusion is supported by the fact that the State made no reference to K.D.'s multiple-event statement during the punishment phase of the trial and did not offer a similar statement through Hicks's testimony. De La Paz's first issue is overruled.

*E. Was Trial Counsel Constitutionally Ineffective?*

De La Paz next argues that his trial counsel was constitutionally ineffective because, even though he objected to Wasson's and Foss's notes, he did not object to a discharge summary prepared by Dr. Paige H. Lemasters that referred to those notes and was also contained within the medical records. De La Paz's stated concern is that we might find that the failure to object to the discharge summary rendered the admission of the medical notes harmless. De La Paz's concern is appropriate but, because we have not factored the discharge summary into our analysis, the lack of an objection did not result in harm; therefore, trial counsel was not constitutionally ineffective. De La Paz's second issue is overruled.

## IV. *Holding*

The judgment of the trial court is affirmed.

February 5, 2009                                    RICK STRANGE

Publish. *See* TEX. R. APP. P. 47.2(b).              JUSTICE

Panel consists of: Wright, C.J.,
McCall, J., and Strange, J.

10