Opinion filed February 5, 2009











 
 
  
 
 







 
 
  
 
 




Opinion filed February 5,
2009

 

 

 

 

 

 

                                                                        In The

                                                                              

    Eleventh
Court of Appeals

                                                                 ____________

 

                                                          No. 11-06-00146-CR 

                                                     __________

 

                                OSCAR
PENA DE LA PAZ, Appellant

                                                             V.

                                        STATE
OF TEXAS, Appellee

 



 

                                          On
Appeal from the 32nd District Court

                                                          Nolan
County, Texas

                                                  Trial
Court Cause No. 10194-B 

 



 

                                                 O
P I N I O N   O N   R E M A N D

 








Oscar
Pena De La Paz[1] was convicted
of two counts of aggravated sexual assault and one count of injury to a child,
was sentenced to seventy-five years confinement for each of the aggravated
sexual assault counts and twenty years confinement for the injury to a child
count, and fined $10,000 for each count.  We affirmed his conviction.  Delapaz
v. State, 229 S.W.3d 795 (Tex. App.CEastland
2007).  The Court of Criminal Appeals reversed, finding that the State failed
to carry its burden of proof to admit hospital records containing statements
made by the victim to a nurse and social worker, and remanded to this court for
a harm analysis.  De La Paz v. State, No. PD-1168-07, 2008 WL 2437648
(Tex. Crim. App. June 18, 2008).  Finding no harm, we affirm.

                                                             I. 
Background Facts

Angie
Medina and De La Paz lived together and had five children, including seven-year-old
K.D.  One afternoon, Medina went shopping with her mother and niece and left De
La Paz with the children.  When she returned home, the kids were playing
outside, and De La Paz was inside with the door locked.  K.D.=s demeanor was
conspicuous.  She was quiet and did not want to talk.  De La Paz
unlocked the door for Medina, and when she went inside, he told her that he had
given the kids a bath.  She thought this was odd because he had never bathed
the girls before B
even though she had asked him to B
and because he put their same clothes back on.  She started to put clean
clothes on the children, but De La Paz told her to wait.  He asked her what
would happen if one of their daughters was molested.  De La Paz then told
Medina that K.D. was bleeding from her Amiddle
spot.@

De
La Paz had blood on his fingers, and K.D. had bloodstained toilet paper in her
vagina.  He did not want Medina to take K.D. to the hospital because he was
concerned that the police and CPS would become involved and would take their
children away, but Medina took K.D. to the Sweetwater hospital=s emergency room anyway. 
Medina called De La Paz from the hospital to update him on K.D.=s condition.  He then told
her that K.D. had complained about a black boy injuring her.  De La Paz also
put K.D.=s sister on
the phone.  In the background, he could be heard telling her to say that K.D.
injured herself when she fell out of a tree.








Sweetwater
law enforcement officials were contacted.  They interviewed Medina at the
hospital.  She consented to a search of her apartment.  When the police
arrived, De La Paz and two children were present.  De La Paz told the officers
that K.D. had been injured while playing outside and that she had come into the
apartment bleeding.  The officers found no sign of any blood dripping on the
front or back porches, on the tile floor, on the furniture, or on the
doorknobs.  They did find damp, bloodstained clothing in the bathroom,
bloodstains on the toilet seat, and bloodstained toilet paper in a trash can. 
De La Paz also told the officers that he had tried to clean K.D.  The bathtub,
however, was dry, and it had dried sand in the bottom.  The police asked De La
Paz to come to the police station for an interview.  He complied and provided
them with a written statement in which he blamed K.D.=s injuries on an unknown black boy.

Meanwhile,
K.D. was transferred to Hendrick Medical Center for further treatment.  She was
diagnosed with a second degree laceration that went approximately one inch into
her vagina and  required surgical intervention to repair.  Hospital personnel
suspected sexual abuse.  Pat Rollins, a Sexual Assault Nurse Examiner from
Hendrick Medical Center, testified that she was unable to obtain a history from
K.D. because her injury was life-threatening.  When Rollins attempted to talk
to K.D., she would Aclam
right up and get real scared.@ 
Rollins described K.D.=s
injury as what you would expect to find in a person who had delivered a baby,
that it was Aclear
evidence of blunt force trauma or penetration,@
and that it was not consistent with a fall.  Dr. Michelle Johnson, a
gynecologist, treated K.D.  She testified that K.D.=s injuries were consistent with penetration by
an adult penis and were probably not caused by a fall.

Two
days after her surgery, K.D. told a hospital social worker and a hospital nurse
that her father had injured her.  De La Paz was subsequently arrested.  He gave
a second statement in jail.  This time, he claimed that he accidentally cut
K.D. while bathing her.  He stated that K.D. was jumping around in the tub and
that he Areached down
by her legs and pulled her hard.  I did not have this planned.  I didn=t plan to go to her
private.  I guess that is when I cut her open.@ 
De La Paz contended that he was scared and that he tried to clean up the blood.

At
trial, De La Paz testified that he bathed the kids while Medina was shopping. 
He put their same clothes back on to avoid having to search for clean clothes. 
After Medina returned home, he heard a knock.  He went to the door and saw
K.D.  She had blood on her fingers and told him that she was bleeding.  He
discovered that she was bleeding from her vagina.  He and Medina tried to clean
up the blood with toilet paper.  When the bleeding persisted, Medina told him
that she was taking K.D. to the doctor.  De La Paz denied trying to discourage
her from doing so.








De
La Paz testified that his first written statement was true.  He testified that
the second statement was not.  De La Paz claimed he was pressured into
admitting that he had poked K.D. with his fingers in exchange for a promise of
community supervision.  The State confronted De La Paz with inconsistencies
between his first written statement and his trial testimony, such as what he was
doing when K.D. knocked on the door.  He blamed these on Medina, claiming that
she asked him to lie.

                                                             II. 
Issues on Remand

De
La Paz argues that he was harmed by the admission of K.D.=s medical records and that
he received ineffective assistance of counsel because counsel did not object to
inadmissible evidence.

                                                                     III.
Analysis

A. 
The Erroneously Admitted Evidence.

The
State offered medical records from Hendrick Medical Center and Rolling Plains
Memorial Hospital that were filed under affidavit.  These records included
notes from Melissa Foss, a social worker employed by Hendrick, and Casey
Wasson, a Hendrick nurse.  Foss interviewed K.D. in her hospital room and asked
what happened.  K.D. told Foss that her dad had poked her with his Apee-pee@ and with his fingers. 
Foss asked K.D. if he had done this before, and K.D. responded, AA lot.@  Foss asked if her father
did this to any of her brothers or sisters, and K.D. shook her head and said, A[J]ust me.@  Foss asked Wasson to come
into K.D.=s room, and
K.D. repeated her accusation.  Foss and Wasson made separate notes of their
conversation with K.D. and included them in K.D.=s
medical records.

De
La Paz objected to Foss=s
and Wasson=s notes,
contending that their admission violated his confrontation clause rights.[2] 
The trial court sustained the objection in part.  The trial court allowed the
State to introduce records containing Foss=s
and Wasson=s questions
and K.D.=s responses
but ordered the State to redact any other third party statement.  On appeal, De
La Paz contended that this was error because he was not allowed to
cross-examine either Foss or Wasson.[3]  We held that
the trial court did not err because Foss=s
and Wasson=s notes
were not testimonial statements.  Delapaz, 229 S.W.3d at 799.  The Texas
Court of Criminal Appeals reversed, holding that the State had failed to carry
its burden to establish that the records were admissible.  2008 WL 2437648 at
*8.

 








B. 
Standard of Review.

The
violation of a defendant=s
right of confrontation is subject to a harmless-error analysis.  Delaware v.
Van Arsdall, 475 U.S. 673 (1986).  We must reverse the conviction unless we
determine beyond a reasonable doubt that the error did not contribute to it.  Tex. R. App. P. 44.2(a).  The emphasis
of a harm analysis is not the propriety of the trial=s outcome but the integrity of the process
that led to the conviction.  Harris v. State, 790 S.W.2d 568, 587 (Tex.
Crim. App. 1989).  The question is not whether the jury verdict was supported
by the evidence.  The question is the likelihood that the constitutional error
was actually a contributing factor in the jury=s
deliberations in arriving at a verdict.  Wells v. State, 241 S.W.3d 172,
177 (Tex. App.CEastland
2007, pet. ref=d).

Courts
have identified several factors to consider in this instance:  (1) how
important was the statement to the State=s
case; (2) whether the statement was cumulative of other evidence; (3) the
presence or absence of evidence corroborating or contradicting the statement on
material points; and (4) the overall strength of the State=s case.  Scott v. State,
227 S.W.3d 670, 690 (Tex. Crim. App. 2007).  We may also consider the source
and nature of the error, the amount of emphasis by the State on the statement,
and the weight that a juror would probably give it.  Id.  Finally, we
presume that the damaging potential of any cross-examination would have been
fully realized had the witness been present to testify.  Baldree v. State,
248 S.W.3d 224, 231 (Tex. App.CHouston
[1st Dist.] 2007, pet. ref=d).

C. 
Did the Notes Contribute to De La Paz=s
Conviction?

1.  The State=s
Case Without the Notes.

K.D.
suffered a second degree laceration to her vagina while she was in De La Paz=s care that was consistent
with penetration by an adult penis. De La Paz had blood on his hands; he acted
suspiciously; he discouraged Medina from changing K.D.=s clothes even though he had just bathed her;
he discouraged Medina from taking K.D. to the hospital; he encouraged his other
daughter to tell Medina that K.D. injured herself when she fell; he provided
two inconsistent statements prior to trial; and his trial testimony was in some
respects at odds with both of these.  The physical evidence was inconsistent
with both written statements and his trial testimony.  Except for
De La Paz=s
claim that an unknown black boy injured K.D., there was no other evidence
implicating anyone else.  This evidence is sufficient to sustain his
conviction.








2.  The Erroneously Admitted Evidence.

After
the State called its last witness, it read the following hospital record
excerpts:

Reviewed
chart and spoke with charge nurse regarding admit dx of vaginal laceration and
alleged sexual assault.  Went to room to talk with patient.  Mom present in room. 
Asked mom to talk with patient for a few minutes in private.  Mom went to
family room.  Began conversation with patient talking about school and she told
me all about her school, teacher and friends.  I then asked patient about what
happened on Saturday before she came to the hospital.  She stated, AI bleeding and daddy gave
me a bath.@  When
asked why she was bleeding, she stated that ADaddy
poked me.@  When asked
what she was poked with, patient stated Ahis
fingers.@

 

I
then asked patient, ADid
daddy poke you with anything else?@ 
Patient stated Awith
his pee-pee.@  I then
asked patient, AHas he
done this to you before?@ 
Patient shook head yes and looked at the floor.  I asked, AHas he done this one time,
two times, or a lot of times?@ 
Patient replied Aa
lot.@  I asked patient
if her dad also did this to her brothers and sisters?  Patient shook her head
no and stated, Ajust
me.@

 

I
called out to the nurses station for charge B
I called out to the nurses station for Charge Nurse C. Wasson, RN, to be a
witness.

 

Casey
asked patient, ACan
you tell me what happened?@ 
Patient looked at the floor and stated, ADaddy
poked me with his pee-pee.@ 
I asked patient, AWhat
else?@  And patient
stated, AHis fingers.@  I asked patient, AWhere was your mom?@  Patient stated, AAt the store.@  Casey left room and I
told patient I needed to make some phone calls and would check on her later. 
Met with mom to discuss conversation with patient.  Asked mom if patient had
told her what had happened.  Mom shook her head yes and told me how her husband
acted very funny when she got home from the grocery store.  Dad bathed patient
which he never does, per mom, and was not concerned with the amount of blood
loss.  Told mom to wait until Monday to take to the doctor.  Mom decided to go
ahead and take patient to hospital because six-year old daughter told her
something bad happened to patient.

 

. .
. .

 

Called
to patient room by M. Foss, LSW.  Mom outside room.  M. Foss, LSW asked
patient, ACan you tell
Ms. Casey what you just told me?@ 
I asked patient, ACan
you tell me what happened?@ 
The patient looked down at a pen she was holding and stated, AMy daddy poked me.@  When asked by myself, AWith what?@  Patient still looking
down stated, AWith his
pee-pee.@  M. Foss,
LSW asked, AAnd what
else?  Was there anything else?@ 
Patient stated, AHis
fingers.@  And then I
left the room.

 








Mom
called out stating patient wanted to speak to us.  L. Calvert, RN and myself in
at bedside.  Patient up in bed coloring.  Patient states, AI saw blood.@  I asked, AWhere did you see the
blood?@  Patient
states, AIn the
toilet.@  L. Calvert
asked, AWhere else?@  Patient states, AIn the bathtub.@  L. Calvert asked, ADid you take a bath before
or after you saw the blood?@ 
Patient states, Aafter.@  L. Calvert asked, ADo you know how the blood
got there?@  Patient
states, Ano@ and nods her head.

 

3.  The Importance of the Medical Notes.

The
State made only a passing reference to the notes in its opening and did not ask
any witness about them during its case.  It did read them to the jury after
calling its last witness, and it asked De La Paz during cross-examination about
K.D.=s accusations. 
But the State started its closing argument by describing the notes as Athe most important evidence
that you have heard in this case.@
The State reread K.D.=s
statement that she was bleeding because her daddy poked her with his Apee-pee@ and fingers and spent the
balance of its closing summarizing the evidence and arguing that it supported
this statement.  The notes were, therefore, important to the State=s case.

4.  Whether the Notes were Cumulative.

The
notes were not cumulative of other evidence.  K.D. did not testify; no other
witness testified that K.D. blamed De La Paz for her injuries; and in fact,
Medina and Rollins both testified that K.D. would not say what had happened.
Finally, there was no other evidence that K.D. was assaulted more than once. 

5.  The Presence or Absence of Corroboration or Contradiction.

The
notes were corroborated.  The medical evidence established that K.D.=s injury was caused by
blunt force trauma or penetration, that it occurred while she was in De La Paz=s care, and that K.D.=s injury was consistent
with penetration by an adult penis but not consistent with a fall.  Medina and
De La Paz corroborated K.D.=s
description of being left alone with him while Medina went shopping.  De La Paz
was the only adult male in the apartment at the time, he had blood on his
fingers, and he acted suspiciously.  The only contradictory evidence was De La
Paz=s denial.

6.  The Strength of the State=s Case.








The
State=s case was
strong.  As noted, medical evidence B
excluding the notes B
indicated that K.D. had been recently sexually assaulted.  De La Paz was
directly implicated by his presence and behavior.  There was no evidence that
K.D. was with any other adult at the time, and De La Paz=s credibility was
questionable at best.

7.  The Effect of Impeaching the Absent Witnesses.

There
is nothing in the record to establish what impeachment evidence De La Paz would
have offered if either Wasson or Foss had testified.  De La Paz suggests that
cross-examination might have established evidence of coaching and that
cross-examination might have developed evidence of K.D.=s state of mind or demeanor.  The record does
not indicate that either area of inquiry would have been fruitful.  

The
State filed a motion to determine K.D.=s
unavailability as a witness, and the trial court conducted an evidentiary
hearing.  The State called Leann Hicks, a counselor, as a witness.  At the time
of the hearing, she had counseled with K.D. for four and one-half months. 
Hicks testified that K.D. was extremely shy and withdrawn and that having to
testify in front of her father would cause emotional harm.  She described K.D.
as delayed academically, cognitively, socially, and emotionally and testified
that K.D. has no concept of time.  Hicks stated that K.D. could describe what
had happened to her and that she understood the difference between the truth
and a lie.  Hicks also testified that K.D. told her that De La Paz had abused her
since she was six years old.  De La Paz=s
cross-examination primarily addressed Hicks=s
qualifications as an expert and her testimony about the harm K.D. would suffer
if forced to testify.  Nothing in that examination supports any inference that
K.D. was coached to implicate her father or that her ability to perceive and
relate events was impacted by her state of mind or demeanor.

De
La Paz filed a motion to suppress K.D.=s
videotaped statement, and the trial court held a second evidentiary hearing. 
The State called Peggy Parrott as a witness.  Parrott was a child interviewer
at the Advocacy Center, and she interviewed K.D.  That interview was recorded,
and De La Paz=s
motion sought to suppress it.  De La Paz=s
cross-examination primarily addressed Parrott=s
compensation by the district attorney=s
office.  Nothing in that examination supports an inference that K.D. was
coached or that her state of mind or demeanor impacted her ability to recall
and relate events.[4]








We
have previously noted that De La Paz did not brief, and therefore did not
preserve, whether he was improperly denied the opportunity to cross-examine K.D. 
However, even if we consider this, the record does not support any inference
that her cross-examination would have negatively impacted the State=s case.  K.D. implicated
her father to Foss and Wasson at the hospital,  during her interview with
Parrott, and during her counseling sessions with Hicks.  K.D.=s contention was consistent
each time.  De La Paz contended that K.D. had lied previously and that this led
to a CPS investigation, but that evidence came in without cross-examining her.

We
are satisfied beyond a reasonable doubt that the notes did not contribute to De
La Paz=s conviction. 
The strength of the State=s
case, De La Paz=s
behavior the day of the event, and his questionable credibility satisfy us that
the notes did not move the jury from a state of unpersuasion to a state of
persuasion.  See Davis v. State, 203 S.W.3d 845, 853 (Tex. Crim. App.
2006).

D. 
Did the Notes Contribute to De La Paz=s
Punishment?

De
La Paz next argues that the notes harmed him during the punishment phase of the
trial because they are the only evidence that he penetrated K.D. on multiple
occasions.  De La Paz reasons that whether it occurred once or on
multiple occasions would be extremely significant.  Because the
seventy-five-year sentences are near the top of the allowable punishment range
for aggravated sexual assault and the twenty-year sentence is the maximum
permissible punishment for injury to a child, the notes clearly impacted the
jury=s punishment
determination.

The
State introduced no other direct evidence during the guilt/innocence phase of
trial that De La Paz abused K.D. on any other occasion although there was
evidence of prior problems.  Medina and De La Paz both acknowledged that they
had been previously investigated by CPS.  The State called Hicks as its sole
witness during the punishment phase of the trial.  She described the effect
this incident has had and will continue to have on K.D.  She echoed a portion
of the hospital notes by testifying that, when she asked K.D. why she was in
counseling, K.D. responded that it was because her daddy poked her with his
finger and Apee-pee.@  Hicks did not, however,
repeat her pretrial testimony that K.D. claimed her father had abused her since
she was six or otherwise suggest that De La Paz abused K.D. more than on this
one occasion. 








During
its initial closing argument, the State made no reference to the medical notes
or to K.D.=s statement
that De La Paz abused her more than once.  Instead, the State referred only to
the single episode giving rise to K.D.=s
hospitalization and asked the jury to consider its impact on her.  The State
also asked the jury to consider De La Paz=s
prior conviction for burglary of a building, his admission that he slapped
Medina around the week before this incident, and his inconsistent statements he
gave police.  During final summation, the State reminded the jury that it had
heard from K.D. through the medical records but did not make any reference to
anything in those records.

We
are convinced beyond a reasonable doubt that the notes did not contribute to De
La Paz=s punishment. 
The jury=s punishment
assessment is severe, but De La Paz=s
prior criminal record, his admitted act of spousal abuse, the harm he caused
K.D., his refusal to accept responsibility, and his attempt to cover up the
incident are more than sufficient to explain the jury=s decision.  That conclusion is supported by
the fact that the State made no reference to K.D.=s
multiple-event statement during the punishment phase of the trial and did not
offer a similar statement through Hicks=s
testimony.  De La Paz=s
first issue is overruled.

E. 
Was Trial Counsel Constitutionally Ineffective?

De
La Paz next argues that his trial counsel was constitutionally ineffective
because, even though he objected to Wasson=s
and Foss=s notes, he
did not object to a discharge summary prepared by Dr. Paige H. Lemasters that
referred to those notes and was also contained within the medical records.  De
La Paz=s stated
concern is that we might find that the failure to object to the discharge
summary rendered the admission of the medical notes harmless.  De La Paz=s concern is appropriate
but, because we have not factored the discharge summary into our analysis, the
lack of an  objection did not result in harm; therefore, trial counsel was not
constitutionally ineffective.  De La Paz=s
second issue is overruled.

                     IV. Holding

The
judgment of the trial court is affirmed.

 

 

February 5, 2009                                                                     RICK STRANGE

Publish.  See Tex.
R. App. P. 47.2(b).                                    JUSTICE

Panel consists of:  Wright, C.J.,

McCall, J., and Strange, J.









[1]Appellant=s
name is spelled differently in the indictment, the judgment, the notice of
appeal, and throughout other places in the record.  We point out that we have
spelled appellant=s name, ADe La Paz,@ because that is the way the Court of Criminal Appeals
has spelled it in its opinion in this case.





[2]U.S. Const. amend. VI.





[3]De La Paz=s
brief referred to his inability to cross-examine K.D., but we found that this
point was not preserved because it was neither raised in the trial court nor
briefed in our court.  Delapaz, 229 S.W.3d at 798 n.2.





[4]The trial court denied the motion to suppress, but the
State did not introduce the interview into evidence at trial.