**Edward Ellis WELLS, Appellant**

v.

**STATE of Texas, Appellee.**

**No. 11–05–00335–CR.**

Court of Appeals of Texas,
Eastland.

Oct. 25, 2007.

Rehearing Overruled Nov. 29, 2007.

Discretionary Review Refused
Feb. 27, 2008.

Edward Ellis Wells, Huntsville, pro se.

H.W. "Woody" Leverett, Jr., Midland, for appellant.

Teresa J. Clingman, Dist. Atty., Eric Kalenak, Asst. Midland County Dist. Atty's Office, Midland, for appellee.

Panel consists of WRIGHT, C.J., McCALL, J., and STRANGE., J.

## OPINION

RICK STRANGE, Justice.

Edward Ellis Wells was indicted on four counts of aggravated sexual assault of a child. The jury found him guilty on all counts and assessed his punishment at fifty years confinement in the Texas Department of Criminal Justice, Institutional Division, for each count.[1] We affirm.

### I. Background Facts

The victim was Wells's stepdaughter. She was twenty-six years old at the time of trial, but testified that Wells began abusing her at age nine and continued until she was thirteen. The first episode occurred one night in 1988. She got out of bed and asked her mom, Lou Ann Wells, if she could go to bed with her. Lou Ann said yes, told her to go on to bed, and said that she would be there later. Wells was already in bed. When the victim got into bed, he started feeling between her legs and stuck his finger into her vagina. Subsequent episodes involved similar physical contact and oral sex. On one occasion, Wells purchased a vibrator and made the victim use it while he watched.

Several days after the original episode, the victim complained to her mother about the incident. Lou Ann confronted Wells. He admitted that he had touched the vic-

---

1. Wells was represented at trial by Warren K. Heagy. We note with sadness that Mr. Heagy passed away shortly after this trial. Mr. Heagy had a long and distinguished career and will be missed by all.

tim's vagina but claimed that he thought it was Lou Ann coming to bed. Lou Ann made Wells leave the house but allowed him to return after a day.

Then in 1992, when the victim was thirteen, Child Protective Services received a complaint concerning Wells and commenced an investigation. Lou Ann had been recently told by her sister and by a friend who had lived with them for two months that Wells was still engaged in inappropriate behavior with the victim. Lou Ann asked the victim if Wells had touched her again and was told yes. Lou Ann confronted Wells at work. He admitted that the victim's allegations were true. Lou Ann was worried about her finances and about the effect the investigation might have on the family. So, she lied to the CPS investigator by saying that she did not know anything about the allegations of wrongdoing. She told the victim to do the same. The victim told the investigator that Wells had walked in on her once while taking a shower but did not claim any other abuse. Wells told the investigator that he had accidentally touched the victim's vagina years earlier when he thought she was his wife but denied any other wrongdoing. CPS completed its investigation. The case was not referred to the district attorney or local police for prosecution.

Wells and Lou Ann were divorced in 1998. He married Melanie Wells in 2000. In 2003, the victim contacted CPS, and it conducted a second investigation. Wells was interviewed, and he again admitted to the 1988 bedtime incident, but maintained that it was an accident. CPS scheduled a hearing. Wells did not appear, but the record is unclear if he was served. Wells and Melanie lived in Texarkana when CPS started its second investigation, but they moved prior to the hearing. When no one appeared at the hearing, CPS closed its investigation. The Midland Police Department subsequently obtained CPS investigatory materials, and Wells was indicted for four counts of aggravated sexual assault of a child.

## II.  *Issues on Appeal*

Wells brings two issues on appeal. First, he contends that the trial court violated the Confrontation Clause by admitting CPS records containing testimonial statements. Second, he contends that the trial court erred in refusing to give a contemporaneous limiting instruction regarding extraneous offenses.

## III.  *Confrontation Clause*

Wells argues that the trial court erred by admitting CPS records containing statements from a witness that he was not given the opportunity to cross-examine. The State offered records from the 1992 CPS investigation under the business records exception to the hearsay rule. These records included an intake form that indicated that an unnamed "collateral" person, who had lived with Wells the last few months, reported that Wells had watched the victim shower and dress, had inappropriately touched the victim, and had made inappropriate comments.

### A.  *Crawford.*

██ The United States Constitution provides a right in both federal and state prosecutions to confront and cross-examine adverse witnesses. *Pointer v. Texas,* 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965).[2] The United States Supreme Court has held that the Confrontation Clause bars the admission of testimonial

---

**2.**  "In all criminal prosecutions, the accused shall enjoy the right to . . . be confronted with the witnesses against him."  U.S. Const. amend.  VI.

statements of a witness who did not appear at trial unless he was unavailable and the defendant was provided an opportunity to cross-examine him. *Crawford v. Washington*, 541 U.S. 36, 53–54, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004). The threshold question when a Confrontation Clause objection is raised is whether the evidence is testimonial or non-testimonial. This is a question of law that we review de novo. *Wall v. State*, 184 S.W.3d 730, 742 (Tex. Crim.App.2006).

The Supreme Court has not provided a comprehensive definition of testimonial evidence. It has, however, stated that the Confrontation Clause applies to those who "bear testimony," which is "a solemn declaration or affirmation made for the purpose of establishing or proving some fact." *Crawford*, 541 U.S. at 51, 124 S.Ct. 1354. Additionally, the Supreme Court offered three formulations to demonstrate the core class of "testimonial" statements: (1) ex parte in-court testimony or its functional equivalent—that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that the declarant would reasonably expect to be used in prosecution; (2) extrajudicial statements contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions; and (3) statements that were made under circumstances that would lead an objective witness reasonably to believe that the statement would be available for use at a later trial. *Id.* at 51–52, 124 S.Ct. 1354.

The Supreme Court again addressed the Confrontation Clause in *Davis v. Washington*, 547 U.S. 813, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006). *Davis* involved a recorded phone conversation between a 911 emergency operator and a domestic abuse victim. The Court held that the victim's statements were not testimonial because she was not acting as a witness. Her statements detailed events as they were actually happening-as opposed to describing past events; she was seeking help against a bona fide physical threat, and her statements were necessary to resolve the present emergency. *Id.* at 2276. The Court stated:

> Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.

*Id.* at 2273–74. In this same opinion, the Court also considered a related case involving statements made by a domestic assault victim to police officers responding to a 911 call. The police arrived, secured the scene, and separated the victim and alleged assailant. One of the officers then interviewed the victim and had her prepare an affidavit. The victim did not appear at trial. The investigating officer was allowed to describe the victim's comments at the scene and to authenticate the victim's affidavit. *Id.* at 2272. The Supreme Court held that the victim's statements were testimonial because they were made during a police investigation and because they described what *had* happened as opposed to what *was* happening. *Id.* at 2278.

*B. Are the Collateral Source's Statements Testimonial?*

▮▮▮ The record provides scant detail of the 1992 conversation between CPS and the collateral source. We do not know the setting of that conversation: whether the

collateral source contacted CPS directly or was referred to CPS, and if so, by whom; the collateral source's sophistication or maturity; or whether the information was volunteered or secured through questioning. We also do not know what the collateral source expected CPS to do with this information. However, we do know that the collateral source described criminal behavior that had already occurred. This is significant because, as the Supreme Court noted in *Davis,* statements describing past criminal events are inherently testimonial since this mimics what a witness does on direct examination. *Id.* at 2278. *Davis* would, therefore, seemingly indicate that the collateral source's allegations were testimonial, but both *Crawford* and *Davis* involved statements to police officers,[3] and the Supreme Court has specifically reserved for future determination whether and when statements made to someone other than a law enforcement official are testimonial. 126 S.Ct. at 2274 n. 2.

Texas courts have not adopted a definitive rule for the application of the Confrontation Clause beyond statements to law enforcement officials but have instead resolved this issue on a case-by-case basis. For example, the Fort Worth Court analyzed *Crawford* and *Davis* in the context of a CPS investigation and found that a video recording of the child victim was testimonial. *See Rangel v. State,* 199 S.W.3d 523, 534–35 (Tex.App.-Fort Worth 2006, pet. granted). Conversely, the Texarkana Court held that statements made by young children to a licensed counselor were not testimonial because the counselor was not acting as a police officer and the counseling sessions were not the functional equivalent of a police interrogation. *See Lollis*

*v. State,* 232 S.W.3d 803 (Tex.App.-Texarkana 2007, no pet. h.).

CPS has broad investigatory authority and responsibility over allegations of abuse committed against a child by their parent or caretaker,[4] and it is statutorily required to investigate anonymous reports of child abuse.[5] Whether the collateral source subjectively appreciated this, the record does not disclose, but knowledge of the law is imputed. *Parker v. Cumming,* 216 S.W.3d 905, 910 (Tex.App.-Eastland 2007, pet. denied).

In *Lollis,* the court noted that, when statements are made outside police interrogations, they are testimonial when a forensic or investigatory motive predominates but are nontestimonial when a therapeutic or healing motive predominates. 232 S.W.3d 803 at 806–07. In that case, the declarant's statements to a counselor were not testimonial, in part, because they had a therapeutic component. In this case, the record contains no indication that the collateral source's report served any purpose other than an investigatory or forensic role.

Because the collateral source was reporting past criminal behavior by Wells to an organization statutorily required to investigate such complaints and because the record contains no evidence that the contact served anything other than an investigative purpose, we find that the statements were testimonial. By this we do not hold that all third-party contact with CPS implicates the Confrontation Clause, merely that the collateral source's allegations in this case were testimonial. Because the allegations were testimonial and because

---

3. In *Davis,* the Court considered the 911 operator's actions to be those of the police for the purposes of that opinion. 126 S.Ct. at 2274 n. 2.

4. *See* TEX. FAM.CODE ANN. § 261.301 et seq. (Vernon 2002 & Supp.2006).

5. *See* Section 261.304.

Wells did not have the opportunity to cross-examine the collateral source, the trial court erred by admitting the 1992 CPS intake form.

### C. Was the Error Harmful?

■■■ A violation of a defendant's right of confrontation is subject to a harmless-error analysis. *Delaware v. Van Arsdall,* 475 U.S. 673, 684, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986). We must reverse the judgment of conviction unless we determine beyond a reasonable doubt that the error did not contribute to the conviction. Tex.R.App. P. 44.2(a). The Texas Court of Criminal Appeals has recently observed that, when performing a harmless-error review in a Confrontation Clause case, the following factors are relevant:

1. the importance of the out-of-court statement to the State's case;

2. whether the out-of-court statement was cumulative of other evidence;

3. the presence or absence of evidence corroborating or contradicting the out-of-court statement on material points; and

4. the overall strength of the prosecution's case.

*Scott v. State,* 227 S.W.3d 670, 690 (Tex. Crim.App.2007). The question is not whether the jury verdict was supported by the evidence. The question is the likelihood that the constitutional error was actually a contributing factor in the jury's deliberations in arriving at a verdict. *Id.* We are convinced beyond a reasonable doubt that it was not.

The trial court did not err by allowing testimony that CPS conducted an investigation in 1992; why that investigation was initiated; or what the victim, Lou Ann, and Wells told the investigator. The error was limited to the admission of the substance of the 1992 anonymous allegation. That allegation played very little role in the

trial. The first reference to it came during the State's opening statement. The prosecutor told the jury:

> But in October, October the 15th of 1992, someone anonymously called Child Protective Services, and they reported that they suspected Eddie Wells was molesting his daughter [the victim] and a Child Protective Service worker, Corinne Rodriguez who you will hear from, began to investigate the case.

The State called Corinne Rodriguez Dickie (she had since married) as a witness, but after first calling the victim and the victim's cousin.

When Dickie testified, the jury had already heard the victim describe several instances in which Wells placed his finger in her vagina, performed oral sex on her, made her use a vibrator while he watched, made her perform oral sex on him, and made her touch his penis. The victim's cousin testified that, during the summer of 1992 when she was thirteen years old, he kissed her on the mouth and touched her breasts.

Dickie testified that, during the 1992 investigation, she advised Wells of the allegations that had been made against him, and she was allowed to testify—for the limited purpose of establishing what she told Wells and not for the truth of the matter—that:

> The allegations were regarding Mr. Wells watching [the victim] shower and watching her dress. And they were also regarding inappropriate remarks he would make to [the victim]. They didn't make any, you know, specific remarks, but—and also that inappropriately touching [the victim].

Subsequent witnesses testified about their conversations with CPS, and the 1992 records themselves were admitted. However, no other witness referenced the 1992 anon-

ymous report. The CPS records describe that report as follows:

> Comp spoke w/ collateral who has lived w/ AP last few months.
>
> The OV had come to collat. in tears saying she couldn't deal w/ him (SFA) watching her dress and shower—his touches were inappropriate (accord to collat.) & inappropriate comments.
>
> Time told is approx. 2 mos. ago.

Finally, during closing argument, the prosecutor told the jury:

> [T]he Child Protective Services records are right here. You can take them into the room with you, you can read every single word, and you can decide if you think that Corinne Dickie is lying. You can read every word that she wrote and you can decide if she made all of that up.

Wells's defensive strategy was to challenge the victim's credibility. He suggested that the victim contacted CPS in 2003 because of an irrational reaction to a scene at the hospital when the victim's younger sister gave birth and several family members, including Wells, came to visit. He pointed out that in 1995 the victim voluntarily worked for him and was alone with him; that during one of the alleged sexual acts the victim's younger sister was in the same bed but did not notice anything; and that, when the victim talked to the CPS investigator in 1992, there was no one else present to pressure her or otherwise prevent her from telling the truth. During his case-in-chief, Wells elicited testimony from several witnesses that the victim's reputation for truthfulness was poor. Finally, Wells testified on his own behalf and denied any wrongdoing.

It is clear that the substance of the 1992 anonymous allegation played no part in the jury's deliberations. The State's case and Wells's defense turned on the victim's credibility. The substance of the 1992 allegation was not material to that determi-

nation. The 1992 allegation was briefly and only tangentially discussed during the testimony, the note itself was cryptic, and neither the State's opening statement nor closing argument repeated it. Furthermore, the wrongdoing alleged in 1992 is significantly different from the victim's allegations at trial. We can say beyond a reasonable doubt that the 1992 anonymous allegation did not contribute to Wells's conviction and, therefore, that the trial court's error was harmless. Issue one is overruled.

### IV. *Limiting Instruction*

■ In Wells's second issue, he contends that the trial court erred by failing to give the jury a limiting instruction regarding extraneous offenses at the time the evidence was admitted into evidence. When evidence that is admissible for one purpose but not for another purpose is admitted, the court, upon request, shall restrict the evidence to its proper scope and instruct the jury accordingly. TEX.R. EVID. 105(a).

The State offered evidence that Wells touched the victim's cousin's breasts to show absence of mistake. A hearing was conducted outside the presence of the jury to determine if the evidence was relevant, extraneous, and whether it was prejudicial. Wells objected to the evidence arguing that its prejudicial effect outweighed its relevancy. The trial court allowed the testimony. Wells requested a limiting instruction to be given to the jury upon admission of the evidence by stating the following:

MR. HEAGY: In light of the Court's ruling, Your Honor, Defendant would respectfully request that the Court give a limiting instruction on the purpose of the admissibility. I think it's pursuant to—

THE COURT: At this time or potentially in the charge?

MS. CLINGMAN: Thank you, Your Honor.

MR. HEAGY: I think it needs to be both.

MS. CLINGMAN: The State believes, Your Honor, that there is no limiting instruction that is necessary as we proffered the testimony. In the Court's charge would be the appropriate place to place any type of limiting instruction.

MR. HEAGY: Definitely then.

MS. CLINGMAN: Absolutely. Uh-huh.

THE COURT: Okay. The Court will grant a limiting instruction to be worded in the charge pertaining to the extraneous evidence.

■ Wells relies upon *Rankin v. State,* 974 S.W.2d 707 (Tex.Crim.App.1996), for the proposition that TEX.R. EVID. 105 requires the trial court to give a limiting instruction at the time the extraneous offense evidence is offered. However, we find that Wells did not preserve this issue for review. A request for a limiting instruction must inform the trial court as to what limitations should be placed upon the evidence. *Puente v. State,* 888 S.W.2d 521, 528 (Tex.App.-San Antonio 1994, no pet.). Wells did not specify what limiting instruction he wanted. Also, when the court stated that the limiting instruction would be included in the charge rather than given contemporaneously, Wells did not object. Accordingly, Wells did not preserve this issue for review. We overrule Wells's second issue on appeal.

## V. *Conclusion*

We affirm the judgment of the trial court.