**Opinion filed August 18, 2011**



In The

# Eleventh Court of Appeals

_____

## Nos. 11-09-00263-CR & 11-09-00268-CR

_____

### JAMAR JAMES RENDER, Appellant

### V.

### STATE OF TEXAS, Appellee

**On Appeal from the 35th District Court**

**Brown County, Texas**

**Trial Court Cause Nos. CR19974 & CR19973**

**O P I N I O N**

In Cause No. 11-09-00263-CR (Trial Court Cause No. CR19974), the jury convicted Jamar James Render of aggravated assault. The jury assessed punishment, enhanced by a prior felony conviction, at confinement for fifteen years. In Cause No. 11-09-00268-CR (Trial Court Cause No. CR19973), the jury convicted appellant of manslaughter. The jury assessed punishment, enhanced by a prior felony conviction, at confinement for thirty years. The trial

court sentenced appellant accordingly and ordered that the sentences run concurrently. We affirm.

*The Charged Offenses*

In Cause No. 11-09-00263-CR, the indictment alleged that, on or about February 28, 2008, appellant committed the offense of aggravated assault by "intentionally, knowingly, or recklessly caus[ing] serious bodily injury to Brent McCormick Tomlinson by hitting him in the head with his hand, a metal object or unknown object, or by causing him to fall and hit his head, or by kicking him." The jury convicted appellant of the charged offense. In Cause No. 11-09-00268-CR, the indictment alleged that, on or about February 28, 2008, appellant committed the offense of murder by "intentionally or knowingly caus[ing] the death of an individual, namely, James Lee Holland, by hitting him in the head with his hand, a metal object or unknown object, or by causing him to fall and hit his head, or by kicking him." The jury convicted appellant of the lesser included offense of manslaughter.

*Issues on Appeal*

Appellant does not challenge the sufficiency of the evidence to support his convictions. Appellant presents nine points of error for review. In his first three points, appellant contends that the trial court erred by admitting testimony that violated the Confrontation Clause and that was inadmissible hearsay. In his fourth point, appellant contends that the trial court erred by denying his motion to quash the indictments. In his fifth and sixth points, appellant asserts that the trial court erred by admitting evidence of an extraneous assault. In his seventh and eighth points, appellant contends that the trial court erred by denying his requested jury instructions on self-defense. In his ninth point, appellant argues that the trial court erred by informing the jury during punishment deliberations that appellant's sentences would be served concurrently.

*The Evidence at Trial*

We have reviewed the evidence, and we will summarize it here. The record shows that, during the night of February 27, 2008, appellant was involved in an altercation with Holland and Tomlinson. At that time, appellant lived in apartment 1002 at the Southside Village Apartments.

Kristi Ramirez and Pablo Celedon lived in apartment 1006 at the Southside Village Apartments. Their apartment was two doors down from appellant's apartment. Ernestina Celedon was Pablo's mother. Kristi knew appellant and his girlfriend, Rebecca York. Kristi testified that, on February 27, 2008, Ernestina came to her apartment. Ernestina told her that

2

people were fighting outside. Kristi said that she could hear a loud argument going on outside. Kristi and Ernestina left the apartment to go to the store. As she left the apartment, Kristi could still hear people arguing. She testified that the argument was between appellant and Holland. Although Kristi did not know Holland at that time, she later learned his identity. Kristi said that she saw a hat in the middle of the parking lot and a man lying facedown on the ground in the handicap parking spot in front of appellant's apartment. The record shows that the man was Tomlinson. Ernestina testified that Tomlinson was shaking like he was dying and that there was a lot of blood on the ground around him. Kristi said that appellant was standing in his doorway. Kristi heard appellant tell Holland that Tomlinson was going to be okay but that he had never been hit that hard before. Kristi said that Holland walked away and appeared to be drunk. Kristi called the police.

On February 27, 2008, at 7:57 p.m., Brownwood Police Officer Troy Grusendorf was dispatched to the apartment complex. When he arrived at the complex, he saw Holland walking across the parking lot and talking on a cell phone. Officer Grusendorf testified that Tomlinson was lying facedown on the pavement. Officer Grusendorf saw vomit and blood on the ground by Tomlinson and could smell the odor of alcohol coming from the concrete. When Officer Grusendorf arrived, appellant was standing over Tomlinson and shaking his shoulder to see whether he was okay. Officer Grusendorf testified that Michael Pierson was at the scene. Appellant and Pierson told Officer Grusendorf that Tomlinson was intoxicated.

Brownwood Police Officer Sky Self also responded to the scene. Officer Self saw Holland walking in the shadows. Upon Officer Self's request, Holland came to him. Officer Self said that Holland was acting extremely nervous and had alcohol on his breath. Holland told Officer Self that there had been an altercation. Officer Self drove Holland to the scene where he said the altercation had occurred. Officer Self said that Tomlinson was lying facedown on the pavement with blood everywhere around him. Officer Self said that Tomlinson was coughing and moaning and that appellant was standing over him.

Brownwood Police Sergeant James Arthur Shannon also arrived at the scene. When he arrived, Tomlinson was lying facedown in the parking lot, and appellant and Pierson were near him. Sergeant Shannon said that it looked like Holland had been in a fight and had been drinking. Sergeant Shannon said that Holland had an abrasion or red mark under his left eye.

Officer Grusendorf believed that Tomlinson had been assaulted because he had a severe laceration on the top of his head. Appellant told Officer Grusendorf that nothing happened in front of his apartment. Appellant told Officer Self that he did not know Tomlinson and Holland. Appellant said that Tomlinson and Holland fought each other and that he tried to break up the fight. He also told Officer Self that he was trying to help Tomlinson get up. Sergeant Shannon spoke with appellant and Pierson and asked to see their hands for possible injuries. Appellant and Pierson did not have any injuries to their hands. Sergeant Shannon said that neither appellant nor Pierson looked like they had been in a fight. Sergeant Shannon said that appellant was calm and cooperative. Appellant told Sergeant Shannon that he heard an argument and then went outside his apartment and saw a man on the ground. The officers did not find any weapon that might have been used in an assault. They did not see any beer bottles, broken bottles, broken glass, beer cans, or spilled liquid in the area where they found Tomlinson.

Roberta Herrera, Mary Ramirez, and Fidencio Ramirez were inside appellant's apartment when the officers arrived at the scene. York was appellant's girlfriend and lived with him. York was not at the apartment when the incident occurred. Sergeant Shannon said that Herrera, Mary, and Fidencio did not have any injuries to their hands. They told him that they did not know anything about a fight. Sergeant Shannon said that a child was asleep upstairs in the apartment.

Appellant and Pierson went inside appellant's apartment. Officer Grusendorf talked with Holland. Officer Grusendorf smelled an odor of alcohol on Holland. Officer Grusendorf said that Holland's demeanor was pretty calm and that Holland appeared to be "punch drunk." Holland was not worried about himself but was instead worried about Tomlinson. Officer Grusendorf believed that Holland might have been struck in his face because he had a mark on it.

Officer Grusendorf thought that Holland and Tomlinson might have fought each other. Officer Grusendorf asked Holland what happened. Holland told him that Tomlinson was his boss. Holland said that he and Tomlinson came to apartment 1002 to visit a man who owed Tomlinson money. Holland said that appellant punched him (Holland) in the face and that he fell back as a result of being hit. Holland said that he then saw appellant punch Tomlinson in the head. Holland also told Officer Grusendorf that "[w]e got jumped by this one." Officer Grusendorf testified that, the more Holland talked, the more disoriented he became.

After Officer Grusendorf spoke with Holland, Officer Self and Sergeant Shannon brought appellant and Pierson out of appellant's apartment. Officer Grusendorf asked Holland whether

4

appellant or Pierson, or both of them, assaulted him. Holland identified appellant as the person who assaulted Tomlinson and him. Holland also said that appellant acted alone and that Pierson was not involved in the assaults. Based in part on the lack of any marks on appellant's hands, Sergeant Shannon did not believe that there was enough evidence to arrest appellant at that time.

The police discovered that Holland had two outstanding traffic warrants. Officer Self arrested Holland on the warrants and took him to jail. Officer Self testified that Holland was curious about whether he would be able to get out of jail that night. At the jail, some marihuana fell to the ground from Holland's possession, and Holland was charged with possession of marihuana.

Paramedics were dispatched to the scene. Paramedic Alvin Stewart attended to Tomlinson. Stewart's initial contact with Tomlinson was at 8:10 p.m. Stewart said that there was a puddle of vomit on the ground near Tomlinson. Tomlinson responded to Stewart with gibberish. Stewart testified that Tomlinson was in and out of consciousness and that Tomlinson had a laceration on the back of his head. Tomlinson was transported to the emergency room at Brownwood Regional Medical Center.

Tara Holland was Holland's wife. Tara testified that Holland worked on an oil rig and that Tomlinson was his boss. Cell phone records that were introduced into evidence showed that there were a number of calls between Tara and Holland on the night of the incident. Specifically, the calls were made at 6:24 p.m., 6:29 p.m., 7:19 p.m., 7:41 p.m., and 7:54 p.m. Tara testified about the calls. She said that, during the 6:24 p.m. call, Holland told her that he was going to appellant's apartment with Tomlinson so that he would not get hurt. Tara testified that appellant owed Tomlinson $80 and that Holland did not want Tomlinson to go to appellant's apartment by himself. During the 6:29 p.m. call, Holland told Tara that they were pulling up to appellant's apartment. Holland also told her that he and Tomlinson had received a call from appellant and that appellant said that he had the $80. Tara said that Holland did not answer when she called him at 7:19 p.m. She said that, at 7:41 p.m., Holland called her and told her that he and Tomlinson had been beaten and were hurt. Holland asked her to come and get them. During the 7:54 p.m. call, Holland told Tara that he was lying on top of Tomlinson and that Tomlinson was hurt. Tara testified that, during the 7:54 p.m. call, she heard appellant talking in the background and heard Holland tell appellant, "You just f---ed up."

Tara went to the apartment complex. She saw Holland in the backseat of a police car. Tara said that Holland's face was bleeding. Tomlinson was lying in the parking lot. He was not moving, and there was a lot of blood around him. Tara said that the officers took Holland out of the police car and that he pointed to appellant. Tara left the scene after Tomlinson was put in the ambulance.

Holland's condition deteriorated at the jail. He had a seizure. Paramedic Stewart went to the jail to transport Holland to the emergency room at Brownwood Regional Medical Center. Stewart's initial contact with Holland at the jail was at 12:16 a.m. Stewart testified that Holland had a knot on the top of his head. Stewart said that Holland was totally unresponsive and that his breathing became distressed on the way to the hospital. Holland was intubated at the hospital. Officer Grusendorf went to the hospital to see Holland. Officer Grusendorf said that, at that time, Holland was "a totally different person." Officer Grusendorf said that Holland was on a ventilator and had slipped into a comatose state. Later, Holland was taken by helicopter to Baylor University Medical Center in Dallas, where he passed away the next night.

After seeing Holland at the hospital, Officer Grusendorf went to appellant's apartment and talked with appellant. Appellant initially falsely identified himself to Officer Grusendorf as Jamar "Warren." Officer Grusendorf then obtained a social security number from appellant and learned his true identity. Appellant had three outstanding warrants, and Officer Grusendorf took him into custody.

Brownwood Police Detective Robert Mullins went to the apartment complex the morning after the incident. He searched the area around appellant's apartment and also looked in the dumpsters near the apartment. He did not find any weapons or anything indicating that an assault had taken place. Detective Mullins did not see any broken bottles, beer bottles, or beer cans in the area around appellant's apartment. He also did not see any damage or stains on appellant's apartment door. Later that day, Detective Mullins spoke with appellant. Detective Mullins gave appellant his *Miranda*[1] warnings. Appellant indicated that he understood the warnings, and he signed a waiver of his rights. Appellant told Detective Mullins that he did not understand why he was in jail because he had not done anything wrong. Appellant told Detective Mullins that he did not know Holland and Tomlinson.

---

[1]*Miranda v. Arizona*, 384 U.S. 436 (1966).

Detective Mullins met with Pierson, Herrera, Mary, and Fidencio. They were inside appellant's apartment when the incident occurred. Detective Mullins said that their stories were somewhat consistent. They said that they did not know anything about a fight. They also said that they were told someone was lying down in the parking lot. Detective Mullins also spoke with Tomlinson's wife, Candice Tomlinson. Candice told him that Tomlinson went to appellant's apartment in an attempt to collect money. Detective Mullins spoke with Tomlinson on March 11, 2008. Tomlinson had no recollection of the incident. Detective Mullins also met with Holland's wife, Tara. Detective Mullins said that he and Tara discussed the phone calls that had taken place between Holland and her on the night of the incident.

Detective Mullins testified that Tomlinson's medical records from the hospital for the date of the incident showed that he had a blood alcohol level of .169. Detective Mullins said that Tomlinson was obviously intoxicated at that time.

Pierson testified that he and his girlfriend, Herrera, sometimes visited appellant at his apartment. Pierson said that he did not know Holland or Tomlinson. Pierson said that, on the date of the incident, he, Herrera, Fidencio, Mary, appellant, and appellant's son were at the apartment. Pierson said that, at about 8:00 p.m., the people inside appellant's apartment "heard something thrown at the door" that sounded like a hard knock. Pierson said that appellant was upstairs taking care of his son. According to Pierson, appellant said, "Well, it's a beer bottle getting thrown at the door." Pierson testified that appellant went outside and shut the door behind him. About five or ten minutes later, appellant came back inside and told Pierson "to go outside to help pick this guy up." Pierson said that a man was lying down in a handicap parking spot with a pool of blood around his head. Pierson testified that he and appellant tried to put the man inside his truck and that the man threw up when they picked him up. Pierson said that he did not ask appellant what had happened to the man. Pierson said that he did not hear fighting or yelling when appellant went outside.

Pierson testified that police officers arrived at the scene when he was helping appellant pick up the man. The police had a man in a police car. Pierson said that the police got the man out of the car and had the man look at appellant and him. Pierson said that the man pointed at appellant and that the man told the police he (Pierson) did not have anything to do with it. Pierson testified that he and appellant went inside appellant's apartment after the police left and that they did not talk about what had happened.

7

Herrera was in appellant's apartment when the incident occurred. She said that she heard what sounded like a glass bottle hitting the door. She also said that it sounded like someone had tossed it "lightly." Appellant went outside to see about the noise. Herrera said that, about five minutes later, appellant came back inside and went upstairs. Herrera said that appellant went back outside. Herrera said that she did not hear anything coming from outside when appellant was outside. About ten minutes later, appellant came inside and told Pierson to go outside to help pick up somebody. Herrera said that the police officers came into the apartment. Herrera said that, upon the officers' request, she, Fidencio, and Mary showed the officers their hands. Herrera testified that she did not know what happened outside the apartment. After the officers left, appellant and Pierson did not say anything about what had happened. Herrera said that she never asked appellant what had happened. Herrera testified that appellant did not look like he had been in a fight. Herrera did not see any evidence that a fight had taken place. She did not see a bottle or any broken glass. Herrera said that the police later came back to the apartment and arrested appellant.

Fidencio testified that he and appellant were friends. Fidencio said that he and his wife, Mary, were sitting on the couch in appellant's apartment when they heard a bottle hit the door. He said that appellant went to the door. Fidencio testified that appellant went outside for about twenty seconds. Fidencio said that he did not hear any kind of disturbance going on in the parking lot. He said that appellant did not tell Pierson to come outside. Fidencio said that the police came inside the apartment and looked at everybody's hands. He also said that, after the police left, the people inside the apartment did not talk about what had happened.

Tomlinson testified that he previously worked on a pulling unit in the oil field business. He said that he met appellant about three weeks before the incident. He said that appellant asked him for a job on one occasion but that he did not have any available work at that time. Tomlinson said that he cannot recall anything that happened for about two weeks leading up to the incident and that he does not remember the incident. About three weeks after the incident, he realized that something had happened to him. He said that he sustained shattered bones in the left side of his face during the incident. After the incident, he had a subdural hematoma.

Candice testified that, about a week or two before the incident, appellant came to her house and told Tomlinson that he needed more time to pay back the money. After the incident, Brandy Smith, who was Tara's sister, told Candice that Tomlinson had been injured. Candice

8

went to the hospital. She said that it looked like Tomlinson had been "beaten to a pulp." Tomlinson was taken by helicopter to Hendrick Medical Center in Abilene. Candice said that Tomlinson did not remember the incident.

Pablo testified that he and appellant were neighbors for about six months. Pablo testified that Kristi called him and said that people were fighting outside the apartments. After receiving Kristi's call, Pablo went to his and Kristi's apartment. The police officers left the scene before Pablo arrived at the apartments. Pablo testified that appellant was standing at his doorstep and looked worried. Appellant called Pablo over to him. Pablo said that appellant told him what had happened. According to appellant, a couple of guys came to his apartment and asked him for a beer. Appellant said that the two guys ended up with a beer and threw it at his door. Appellant also told Pablo that the men made gestures at him and called him names. Pablo testified that he saw a "beer splatter" on appellant's door. Appellant told Pablo that "[h]e hit one time" and the guy "went straight to the ground." Pablo said that there was a big pool of blood on the street. Appellant said that the men came toward him and that he reacted by hitting both of them with his hand. Appellant told Pablo that he knocked one of the guys out with one punch. Pablo gave a statement to the police. In his statement, Pablo said that appellant "started bragging about how the police didn't think it was him."

Stephen Atkins lived at the Southside Village Apartments on the date of the incident. He said that he was outside when the incident started. Atkins said that he saw a pickup pull up to appellant's apartment. He said that two guys got out of the pickup and then banged on appellant's door. According to Atkins, appellant answered the door and then an argument started between appellant and the men. Atkins testified that he did not have a good view of the incident. However, he said that one of the men "buckled up" like he wanted to have an altercation with appellant. Atkins said that appellant pushed the man away. Atkins said that he then went inside his apartment and told his wife, "I think they are going to fight out there." Atkins said that he did not see anything else after going inside his apartment.

Royce Gober testified that he was in jail in February 2008. Gober heard appellant tell someone that, while he was at home watching his child, he heard a commotion outside. Appellant said that he went outside and saw one man on the ground and another man walking away. Appellant said that he tried to pick up the man from the ground. Appellant also told the individual that he did not have anything to do with the fight.

9

Brandon Clark was a jailer at the Brown County Jail. Appellant was in jail on June 18, 2008. Clark testified that there was an incident involving appellant on that date. Appellant was upset about the television in his cell being turned off. Clark testified that he listened to a conversation between appellant and another inmate on the intercom. Clark testified that appellant told the other inmate that the officers "need[ed] to quit f---ing with him"; that "he had done beat one person to death and he would do it again"; and that, "if the officers [did] not quit f---ing with him[,] he [would] f---ing show them." Clark testified that appellant told the other inmate that his hands were lethal weapons.

Pedro Delarosa and appellant had been cellmates in jail. Delarosa had known appellant before they were in jail together. He also had known Holland and Tomlinson. Delarosa testified that appellant told him that appellant sold Tomlinson and Holland drugs and that they were unhappy with the drugs. Appellant said that Tomlinson and Holland beat and kicked his apartment door and threw beer bottles at it. Appellant told Delarosa that he, Tomlinson, and Holland all threw blows. Appellant said that he hit Tomlinson and Holland in defense. According to Delarosa, appellant said that he hit Holland and that Holland then ricocheted off a vehicle, fell, and hit his head on a curb or parking block. According to Delarosa, appellant also said that he hit Tomlinson and that Tomlinson then became dazed and took off. Apparently, Delarosa referred to Holland as Tomlinson and Tomlinson as Holland by mistake because the evidence showed that Tomlinson was lying facedown in the parking lot and that Holland walked away after the altercation.

The State presented detailed medical evidence about Holland's and Tomlinson's injuries. Michael Lyons, M.D. treated Tomlinson in the emergency room at the Brownwood Regional Medical Center. Tomlinson was uncooperative and unable to provide any coherent information. He had bruising around both eyes and a laceration on his head. A CAT scan showed that Tomlinson had a subdural hematoma times two. He had fractured bones on the left side of his face. He was transferred to Hendrick Medical Center. Dr. Lyons also treated Holland. Holland was brought to the emergency room with a complaint of seizures. Dr. Lyons said that Holland was unresponsive and stopped breathing. Holland was intubated. Dr. Lyons said that Holland had a fairly large epidural hematoma on the right side of his brain and that he had a right to left shift of the brain. Dr. Lyons said that Tomlinson had a blood alcohol level of about .13 and that Holland had a blood alcohol level of about .01.

Dr. Janis Townsend-Parchman testified that she was a medical examiner for Dallas County. She performed an autopsy on Holland. She described in detail Holland's head injuries. She said that he had injuries that were consistent with having received three separate blows to the head. Dr. Townsend-Parchman testified that Holland died as a result of blunt force head injuries. She said that blunt force injuries can be caused when an individual gets hit with a blunt instrument or when an individual hits a blunt instrument. Dr. Townsend-Parchman explained that, if someone gets into a scuffle and gets pushed down, the ground can serve as a blunt instrument. She testified that the blunt force head injuries that caused Holland's death could have been caused by him falling and hitting the ground or by him being struck in the head with a relatively broad object, such as a fist. She said that there is no way to determine whether those injuries were caused by a fall or from an object striking his head.

Dr. Lee Ann Grossberg testified as a defense expert. She was a forensic pathologist. Dr. Grossberg testified in detail about Tomlinson's and Holland's injuries. She said that the injury to the right side of Tomlinson's head was his most serious injury and was most consistent with a fall. Dr. Grossberg also said that the most likely cause of the injury to the right side of Holland's head was a fall to a very hard surface.

The State called Raymond Aaron Laviolette to testify about an extraneous assault. Laviolette testified that he and appellant had been neighbors at the Driftwood Apartments in 2007. Laviolette testified about an incident that involved appellant and a man named "Mike." Laviolette did not know Mike's last name. The incident occurred during the summer of 2007. Laviolette said that he and others were playing volleyball and drinking beer outside at the Driftwood Apartments. Mike left one of the apartments and walked away with his bike. Laviolette said that somebody "popped off" about the way Mike was dressed. Mike responded that he knew karate. When Mike got to the end of the street, he yelled something. Appellant asked the group drinking and playing volleyball whether they wanted him to hit Mike. Laviolette testified that everybody responded, "Yeah, go hit him." Laviolette testified that appellant went to Mike and "smacked him." Laviolette said that appellant hit Mike hard in the mouth and that Mike went down to the ground. Laviolette said that appellant's knuckle was "busted open" after he hit Mike.

11

*Confrontation Clause and Hearsay Issues*

In his first three points of error, appellant argues that the trial court erred in admitting Officer Grusendorf's testimony as to the statements Holland made to him about the altercation involving appellant, Holland, and Tomlinson. Specifically, in his first point, appellant complains that Officer Grusendorf's testimony violated his rights under the Confrontation Clause. In his second point, appellant contends that the State failed to meet its burden to show that the testimony was admissible under the Confrontation Clause. In his third point, appellant contends that Officer Grusendorf's testimony was inadmissible hearsay.

At trial, appellant objected to Officer Grusendorf's testimony about Holland's statements on Confrontation Clause and hearsay grounds. The State argued that the Confrontation Clause did not bar Officer Grusendorf's testimony for two reasons. First, the State argued that Holland's statements were "akin to dying declarations." Second, the State argued that appellant had waived his right to confront Holland based on the doctrine of forfeiture by wrongdoing. The trial court found that the State met its burden of showing that appellant had forfeited by wrongdoing his right to confront Holland and that, therefore, the Confrontation Clause did not bar Officer Grusendorf's testimony. The trial court also found that Holland's statements were not dying declarations. With respect to appellant's hearsay objections, the trial court found that Holland's statements satisfied multiple hearsay exceptions. Therefore, the trial court admitted Officer Grusendorf's testimony.

Generally, we review a trial court's decision to admit evidence under an abuse of discretion standard. *Wall v. State*, 184 S.W.3d 730, 743 (Tex. Crim. App. 2006); *Angleton v. State*, 971 S.W.2d 65, 67 (Tex. Crim. App. 1998). However, in reviewing a Confrontation Clause objection, we review the constitutional ruling de novo. *Wall*, 184 S.W.3d at 742-43.

The Confrontation Clause of the Sixth Amendment provides a right in both federal and state prosecutions to confront and cross-examine adverse witnesses. U.S. CONST. amends. VI, XIV; *Pointer v. Texas*, 380 U.S. 400, 406 (1965); *Woodall v. State*, 336 S.W.3d 634, 641 (Tex. Crim. App. 2011). The principal concern of the Confrontation Clause is to ensure the reliability of the evidence against a criminal defendant by subjecting it to rigorous testing in the context of an adversary proceeding before the trier of fact. *Maryland v. Craig*, 497 U.S. 836, 845 (1990). Whether a statement is admissible under the rules of evidence and whether that same statement is admissible under the Confrontation Clause are separate questions. *Crawford v. Washington*, 541

U.S. 36, 50-51 (2004); *Wall*, 184 S.W.3d at 734-35. Thus, even when a statement offered against a defendant is admissible under evidentiary rules, the statement may implicate the Sixth Amendment's Confrontation Clause. *Gonzalez v. State*, 195 S.W.3d 114, 116 (Tex. Crim. App, 2006); *Clark v. State*, 282 S.W.3d 924, 930 (Tex. App.—Beaumont 2009, pet. ref'd).

The Confrontation Clause bars the admission of out-of-court testimonial statements of a witness unless the witness is unavailable to testify and the defendant had a prior opportunity to cross-examine the witness. *Crawford*, 541 U.S. at 53-54; *Wells v. State*, 241 S.W.3d 172, 174-175 (Tex. App.—Eastland 2007, pet. ref'd). Post-*Crawford*, the threshold question in any Confrontation Clause analysis is whether the statements at issue are testimonial or nontestimonial in nature. *Campos v. State*, 256 S.W.3d 757, 761 (Tex. App.—Houston [14 Dist.] 2008, pet. ref'd); *Wells*, 241 S.W.3d at 175. Generally, a statement is testimonial when the surrounding circumstances objectively indicate that the primary purpose of the interview or interrogation is to establish or prove past events potentially relevant to later criminal prosecution. *Davis v. Washington*, 547 U.S. 813, 822-23 (2006); *De La Paz v. State*, 273 S.W.3d 671, 680 (Tex. Crim. App. 2008). In such circumstances, the person offering information is literally bearing testimony. *De La Paz*, 273 S.W.3d at 680. In the context of police inquiries, out-of-court statements made to police are not considered testimonial if they are made to enable police assistance to meet an ongoing emergency. However, they are considered testimonial if there is no such ongoing emergency, and the primary purpose of the police interrogation is to establish or prove past events potentially relevant to later criminal prosecution. *Davis*, 547 U.S. at 822; *Langham v. State*, 305 S.W.3d 568, 576 (Tex. Crim. App. 2010); *Vinson v. State*, 252 S.W.3d 336, 338 (Tex. Crim. App. 2008).

According to Officer Grusendorf, Holland said that he and Tomlinson went to apartment 1002 to visit a man who owed Tomlinson money, that appellant punched him in the face, that appellant punched Tomlinson in the head, and that he and Tomlinson "got jumped" by appellant. At trial, the State did not assert, and the trial court did not conclude, that Holland's statements to Officer Grusendorf were nontestimonial. The evidence shows that no ongoing emergency existed when Holland made the statements to Officer Grusendorf. Instead, the statements were made to establish or prove past events potentially relevant to a later criminal prosecution. As such, Holland's statements were testimonial in nature. *Davis*, 547 U.S. at 822.

13

The United States Supreme Court has recognized two common-law exceptions to a defendant's right of confrontation: dying declarations and forfeiture by wrongdoing. *Giles v. California*, 554 U.S. 353, 358-59 (2008). In this case, the State argues that appellant forfeited his constitutional right to confront Holland by killing him. The rule of forfeiture by wrongdoing extinguishes confrontation claims on equitable grounds. *Davis*, 547 U.S. at 833; *Crawford*, 541 U.S. at 62. Forfeiture by wrongdoing is a common-law rule that permits the introduction of statements of a witness who is detained or kept away from trial by the means or procurement of the defendant. *Giles*, 554 U.S. at 359. Under the rule of forfeiture by wrongdoing, a defendant forfeits the right to confront a witness if he engages in wrongful conduct that is designed to prevent the witness from testifying. *Id.* at 360. A defendant does not forfeit the right of confrontation by merely engaging in conduct that causes the witness to be absent. Rather, to establish a forfeiture of the right, it must be shown that the defendant engaged in wrongful conduct specifically for the purpose of preventing the witness from testifying. *Id.* at 361; *Davis v. State*, 268 S.W.3d 683, 706 (Tex. App.—Fort Worth 2008, pet. ref'd).

The State presented evidence that appellant killed Holland. However, there is no evidence that appellant killed Holland to prevent him from testifying. To the contrary, the evidence shows that appellant allowed Holland to walk away after the altercation. Holland's injuries did not appear to be life-threatening when the officers arrived at the scene, when he talked to the officers at the scene, or when he was taken to jail. The record does not support a finding that appellant killed Holland with the intent to prevent him from testifying. Therefore, the trial court erred by ruling that appellant forfeited his right to confront Holland and by admitting evidence of Holland's statements.

We note that the trial court correctly found that Holland's statements to Officer Grusendorf did not fall within the dying declarations exception to the right of confrontation. The dying declarations exception has historically applied to "declarations made by a speaker who was both on the brink of death and aware that he was dying." *Giles*, 554 U.S. at 358. At the scene, neither the officers nor Holland believed that he had serious injuries. The evidence belies the contention that he was aware he was dying when he made the statements to Officer Grusendorf.

Error in admitting evidence in violation of the Confrontation Clause is constitutional error and, therefore, subject to a harm analysis under Rule 44.2(a) of the Texas Rules of

14

Appellate Procedure. Tex. R. App. P. 44.2(a); *Langham*, 305 S.W.3d at 582. Under Rule 44.2(a), we must reverse a judgment of conviction unless we determine beyond a reasonable doubt that the error did not contribute to the conviction. Rule 44.2(a). The following factors are relevant to determining whether constitutional error under *Crawford* may be declared harmless beyond a reasonable doubt: (1) the importance of the out-of-court statement to the State's case; (2) whether the statement was cumulative of other evidence; (3) the presence or absence of evidence corroborating or contradicting the statement on material points; and (4) the overall strength of the State's case. *Scott v. State*, 227 S.W.3d 670, 690 (Tex. Crim. App. 2007); *Davis v. State*, 203 S.W.3d 845, 852 (Tex. Crim. App. 2006); *Wells*, 241 S.W.3d at 177.

The emphasis of a harm analysis under Rule 44.2(a) should not be on the propriety of the outcome of trial. *Scott*, 227 S.W.3d at 690. Rather, we must determine whether the error adversely affected the integrity of the process leading to the conviction. *Id.* The question for the reviewing court is not whether the jury verdict was supported by the evidence. *Id.* Instead, the question is the likelihood that the constitutional error was actually a contributing factor in the jury's deliberations in arriving at the verdict. *Id.* In performing a harm analysis, a reviewing court may also consider the source and nature of the error, the amount of emphasis by the State on the erroneously admitted evidence, and the weight the jury may have given the erroneously admitted evidence compared to the balance of the evidence with respect to the element or defensive issue to which it is relevant. *Id.*

With the above considerations in mind, we must determine whether there is a reasonable possibility that the *Crawford* error moved the jury from a state of non-persuasion to one of persuasion on a particular issue. *Scott*, 227 S.W.3d at 690; *Davis*, 203 S.W.3d at 852-53. Ultimately, if we are to affirm, we must be satisfied beyond a reasonable doubt, after considering the various factors, that the error did not contribute to the conviction. *Scott*, 227 S.W.3d at 690-91.

Holland's statements were important to the State's case because they provided evidence that appellant was involved in an altercation with Tomlinson and him, that appellant was the aggressor, and that appellant assaulted both of them. Holland's statements contradicted appellant's claims to the police that he was not involved in an altercation and that Holland and Tomlinson fought each other. However, Holland's statements were cumulative of, and

corroborated by, other testimonial evidence and were consistent with physical evidence showing that he and Tomlinson had been assaulted.

Kristi heard a loud argument going on between appellant and Holland, and she saw Tomlinson lying on the ground. She also heard appellant tell Holland that Tomlinson had never been hit that hard before. On the night of the altercation, appellant told Pablo that he hit both Holland and Tomlinson. Appellant also told his cellmate, Delarosa, that he hit Holland and Tomlinson. Clark, the jailer, heard appellant tell another inmate that he had beaten one person to death and that he would do it again. Pierson testified that appellant went outside his apartment and then, about five or ten minutes later, asked him to help pick up Tomlinson. Herrera gave similar testimony. Appellant called Atkins as a witness. Atkins testified that appellant got into an argument with Holland and Tomlinson. This evidence is cumulative of, and corroborates, Holland's statements that appellant assaulted Tomlinson and him. The injuries sustained by Holland and Tomlinson were consistent with both of them being hit in the head. Witnesses described the injuries in detail, and the State also introduced medical records into evidence that established the nature of those injuries. Viewing all the evidence, including appellant's admissions that he hit Holland and Tomlinson, we conclude that the State presented a strong case of appellant's guilt.

Although appellant told the police that he was not involved in an altercation, he claimed at trial that he was acting in self-defense when he hit Holland and Tomlinson. Holland's statements, if believed, established that appellant was the aggressor in the altercation.

Appellant relied on other testimony in an attempt to establish that Holland and Tomlinson were the aggressors. According to Pablo, appellant told him that Holland and Tomlinson came toward him and that he reacted by hitting both of them. According to Delarosa, appellant told him that he hit Holland and Tomlinson in defense. Atkins said that one of the men "buckled up" as if he wanted to fight appellant. Pierson testified that something was thrown at appellant's apartment door. Herrera and Fidencio testified that they heard what sounded like a bottle hit appellant's apartment door. While this testimony, if believed, might provide some support for appellant's claim that he acted in self-defense, the State presented evidence, as detailed above, corroborating Holland's statements and establishing the nature of Holland's and Tomlinson's injuries. Because Holland's statements were cumulative of, and corroborated by, other evidence,

16

we conclude that the evidence of Holland's statements would not have materially affected the jury's deliberations on appellant's self-defense issues.

After carefully reviewing the record, we conclude beyond a reasonable doubt that the error in admitting Holland's statements did not contribute to appellant's conviction or punishment. Therefore, the error was harmless. Appellant's first two points of error are overruled.

Based on our ruling on appellant's first two points of error, we need not decide whether Officer Grusendorf's testimony as to Holland's statements was also inadmissible as hearsay. A violation of the evidentiary rules resulting in the erroneous admission of evidence is nonconstitutional error and is, therefore, subject to a harm analysis under Rule 44.2(b). *Motilla v. State*, 78 S.W.3d 352, 355 (Tex. Crim. App. 2002); *Gately v. State*, 321 S.W.3d 72, 77 (Tex. App.—Eastland 2010, no pet.). Under Rule 44.2(b), we are to disregard any error unless it affected the defendant's substantial rights. We have concluded that the trial court's error in admitting Holland's statements was harmless under the more stringent standard imposed by Rule 44.2(a) for analyzing harm of constitutional errors. Therefore, even assuming that Holland's statements were also inadmissible hearsay under the Rules of Evidence, we need not conduct a separate harm analysis under the less stringent standard imposed by Rule 44.2(b) for analyzing harm of nonconstitutional errors. *Guidry v. State*, 9 S.W.3d 133, 151 n.14 (Tex. Crim. App. 1999). Appellant's third point of error is overruled.

*Evidence of Extraneous Assault*

Appellant argues in his fifth and sixth points of error that the trial court erred by admitting evidence of the assault that he allegedly committed against "Mike." In his fifth point, appellant contends that evidence of the extraneous assault was inadmissible under Rule 404 of the Rules of Evidence. *See* TEX. R. EVID. 404. In his sixth point, appellant contends that evidence of the extraneous assault was inadmissible under Rule 403 of the Rules of Evidence because the probative value of the evidence was substantially outweighed by the danger of unfair prejudice. *See* TEX. R. EVID. 403.

As stated above, we review a trial court's decision to admit evidence under an abuse of discretion standard. *Wall*, 184 S.W.3d at 743; *Angleton*, 971 S.W.2d at 67. A defendant's prior crimes or bad acts are generally inadmissible to prove that he has a bad character or a propensity to commit the offense charged. *Robinson v. State*, 844 S.W.2d 925, 928 (Tex. App.—Houston

17

[1st Dist.] 1992, no pet.). Such evidence, however, may be admissible for other purposes, such as proof of motive, intent, plan, knowledge, or lack of mistake or accident. Rule 404(b). The "other purposes" listed in Rule 404(b) are not exclusive or exhaustive but are merely representative. *Robinson*, 844 S.W.2d at 929. When an accused raises a self-defense theory, the State may introduce evidence of prior violent acts where the accused was an aggressor in order to show his intent and to rebut the defense. *Halliburton v. State*, 528 S.W.2d 216, 218 (Tex. Crim. App. 1975); *Jones v. State*, 241 S.W.3d 666, 669 (Tex. App.—Texarkana 2007, no pet.); *Robinson*, 844 S.W.2d at 929.

Appellant's counsel asserted during opening statement that appellant had acted in self-defense. Appellant attempted to establish that Holland and Tomlinson were the aggressors in the altercation and that he was merely defending himself. The State called Laviolette as a rebuttal witness. He testified about appellant's prior assault of "Mike." Evidence of appellant's assault of Mike was admissible under Rule 404(b) to show appellant's intent and to rebut his theory of self-defense. *Jones*, 241 S.W.3d at 669-70; *Robinson*, 844 S.W.2d at 929. Appellant's fifth point of error is overruled.

Under Rule 403, relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice. Rule 403 favors admission of relevant evidence and carries a presumption that relevant evidence will be more probative than prejudicial. *Hayes v. State*, 85 S.W.3d 809, 815 (Tex. Crim. App. 2002). Evidence is unfairly prejudicial when it has an undue tendency to suggest an improper basis for reaching a decision. *Reese v. State*, 33 S.W.3d 238, 240 (Tex. Crim. App. 2000). A Rule 403 analysis by the trial court should include, but is not limited to, the following considerations: (1) the probative value of the evidence; (2) the potential of the evidence to impress the jury in some irrational, indelible way; (3) the time the proponent needs to develop the evidence; and (4) the proponent's need for the evidence. *Erazo v. State*, 144 S.W.3d 487, 489 (Tex. Crim. App. 2004). In evaluating a trial court's determination under Rule 403, a reviewing court is to reverse the trial court's judgment "rarely and only after a clear abuse of discretion." *Mozon v. State*, 991 S.W.2d 841, 847 (Tex. Crim. App. 1999).

In this case, the extraneous assault is similar to the charged offenses. Laviolette testified that appellant took "Mike" to the ground with one punch to the mouth. If believed, Laviolette's testimony showed that appellant acted as an aggressor and violently assaulted "Mike." The

extraneous assault occurred only about six months before appellant's altercation with Holland and Tomlinson. Evidence of appellant's prior assault of "Mike" had high probative value on the issue of whether appellant was the aggressor in his altercation with Holland and Tomlinson. The trial court gave the jury an appropriate limiting instruction under Rule 404(b) before Laviolette testified about the extraneous assault. The trial court also included appropriate extraneous offense instructions in the charge. The limiting instructions given by the trial court likely eliminated any potential that the extraneous offense evidence would impress the jury in some irrational, indelible way. Laviolette's testimony did not take a significant amount of time. The State needed to present the evidence to rebut appellant's claim of self-defense. After balancing the Rule 403 factors, we conclude that the trial court could have reasonably determined that the probative value of the evidence of the extraneous assault was not substantially outweighed by the danger of unfair prejudice. The trial court did not abuse its discretion by admitting the evidence. Appellant's sixth point of error is overruled.

*Appellant's Requested Jury Instructions on Self-Defense*

Appellant contends in his seventh and eighth points of error that the trial court erred by denying his requests for jury instructions (1) that a person's belief that the use of force against another is immediately necessary is presumed to be reasonable if the person knew or had reason to believe that the other person was attempting to commit robbery or aggravated robbery and (2) that a person's belief that the use of deadly force against another is immediately necessary is presumed to be reasonable if the person knew or had reason to believe that the other person was attempting to commit robbery or aggravated robbery.

A trial court must charge the jury fully and affirmatively on the law applicable to every issue raised by the evidence. TEX. CODE CRIM. PROC. ANN. art. 36.14 (Vernon 2007). If evidence from any source raises a defensive theory, it must be included in the court's charge. *Ferrel v. State*, 55 S.W.3d 586, 591 (Tex. Crim. App. 2001); *Taylor v. State*, 856 S.W.2d 459, 470-71 (Tex. App.—Houston [1st Dist.] 1993), *aff'd*, 885 S.W.2d 154 (Tex. Crim. App. 1994). A defendant is entitled to an instruction on self-defense if the issue is raised by the evidence regardless of whether that evidence is strong, weak, unimpeached, or contradicted and regardless of what the trial court may think about the credibility of the defense. *Walters v. State*, 247 S.W.3d 204, 209 (Tex. Crim. App. 2007); *Ferrel*, 55 S.W.3d at 591. However, if the evidence,

19

viewed in the light most favorable to the defendant, does not establish self-defense, the defendant is not entitled to an instruction on the issue. *Ferrel*, 55 S.W.3d at 591.

The trial court submitted numerous self-defense instructions to the jury. The trial court instructed the jury, "Upon the law of self-defense, you are instructed that a person is justified in using force against another when and to the degree that the actor reasonably believes the force is immediately necessary to protect the actor against the other's use or attempted use of unlawful force." *See* TEX. PENAL CODE ANN. § 9.31(a) (Vernon 2011). The trial court also instructed the jury that such a belief is presumed to be reasonable "if the actor knew or had reason to believe that the person against whom the force was used unlawfully and with force attempted to enter the actor's occupied habitation and the actor did not provoke the person. . . .and was not otherwise engaged in criminal activity at the time the force was used." *Id.* § 9.31(a)(1)(A). The trial court submitted similar instructions with respect to a person's use of deadly force in self-defense. *Id.* § 9.32(a)(1), (a)(2)(A), (b)(1)(A).

Appellant complains about the trial court's refusal to include instructions that a person's belief that the use of force and deadly force is immediately necessary is presumed to be reasonable if the person knew or had reason to believe that the person against whom the force was used was committing or attempting to commit robbery or aggravated robbery. *See* Section 9.31(a)(1)(C) and Section 9.32(b)(1)(C). A person commits aggravated robbery when he commits robbery and he causes serious bodily injury to another or uses or exhibits a deadly weapon. TEX. PENAL CODE ANN. § 29.03(a)(1), (2) (Vernon 2011). A person commits robbery if, in the course of committing theft and with intent to obtain or maintain control of the property, he intentionally, knowingly, or recklessly causes bodily injury to another or intentionally or knowingly threatens or places another in fear of imminent bodily injury or death. *Id.* § 29.02(a)(1), (2). A person commits theft if he unlawfully appropriates property with the intent to deprive the owner of the property. *Id.* § 31.03(a).

We have summarized the evidence above. There was no evidence that Holland and Tomlinson were committing or attempting to commit robbery or aggravated robbery against appellant. Likewise, the record lacks evidentiary support for the contention that appellant knew or had reason to believe that Holland and Tomlinson were committing or attempting to commit robbery or aggravated robbery. Based on the evidence, appellant could not have formed a reasonable belief that Holland and Tomlinson were engaging in such conduct. Because the

20

evidence did not raise the issues presented by appellant's requested "robbery" and "aggravated robbery" instructions, the trial court did not err by refusing to submit those instructions to the jury. *Ferrel*, 55 S.W.3d at 591; *Preston v. State*, 756 S.W.2d 22, 25 (Tex. App.—Houston [14th Dist.] 1988, pet. ref'd). Appellant's seventh and eighth points of error are overruled.

*Trial Court's Instruction on Concurrent Sentences*

In his ninth point of error, appellant contends that the trial court erred by informing the jury during punishment deliberations that his sentences would run concurrently. While deliberating appellant's punishment, the jury sent the trial court a note asking "will or can" the two sentences run concurrently. Over appellant's objection, the trial court responded to the jury's question as follows:

> Under the law, the court is required to run the sentences concurrently since the two cases were tried together. I refer you to the court's charge for all of the instructions you are to follow.

Except under certain circumstances, if an accused has been found guilty of more than one offense, the offenses arose out of the same criminal episode, and the offenses were prosecuted in a single criminal action, the sentences assessed for the offenses must run concurrently. TEX. PENAL CODE ANN. § 3.03(a) (Vernon 2011). Those certain circumstances do not apply here. Thus, the trial court was required to order that appellant's sentences for the subject manslaughter and aggravated assault convictions run concurrently. In such cases, a trial court does not abuse its discretion by informing the jury, in response to a question from the jury, that the sentences will run concurrently. *Haliburton v. State*, 578 S.W.2d 726, 729 (Tex. Crim. App. [Panel Op.] 1979); *Dickson v. State*, 986 S.W.2d 799, 804 (Tex. App.—Waco 1999, pet. ref'd). Appellant's ninth point of error is overruled.

*The Indictments*

In his fourth point of error, appellant contends that the trial court erred by denying his motion to quash the indictments because they failed to provide him fair notice of the manner and means by which he allegedly committed the offenses. We review the denial of a motion to quash de novo. *State v. Moff*, 154 S.W.3d 599, 601 (Tex. Crim. App. 2004); *Jones v. State*, 333 S.W.3d 615, 623 (Tex. App.—Dallas 2009, pet. ref'd). The right to notice is set forth in both the United States and Texas Constitutions. U.S. CONST. amend. VI; TEX. CONST. art. I, § 10; *Moff*, 154 S.W.3d at 601; *State v. Rodgers*, 214 S.W.3d 644, 647 (Tex. App.—Eastland 2006, pet.

ref'd). A charging instrument must be specific enough to inform the accused of the nature of the accusation against him so that he may prepare a defense. *Moff*, 154 S.W.3d at 601; *Rodgers*, 214 S.W.3d at 647.

Each of the subject indictments alleged that appellant committed a single offense. The indictments alleged alternative manner and means of committing those offenses. As stated above, the indictments alleged that appellant committed the offense of aggravated assault by "intentionally, knowingly, or recklessly caus[ing] serious bodily injury to [Tomlinson] by hitting him in the head with his hand, a metal object or unknown object, or by causing him to fall and hit his head, or by kicking him" and that appellant committed the offense of murder by "intentionally or knowingly caus[ing] the death of [Holland] by hitting him in the head with his hand, a metal object or unknown object, or by causing him to fall and hit his head, or by kicking him." The State is allowed to anticipate variances of proof at trial by pleading alternative manner and means in the indictment. *Rosales v. State*, 4 S.W.3d 228, 236 (Tex. Crim. App. 1999); *Hammock v. State*, 211 S.W.3d 874, 879 (Tex. App.—Texarkana 2006, no pet.); *Price v. State*, 59 S.W.3d 297, 301 (Tex. App.—Fort Worth 2001, pet. ref'd). In these causes, the State alleged alternative manner and means in clear and concise language. We conclude that the indictments gave appellant sufficient notice of the charged offenses to allow him to prepare a defense. Appellant's fourth point of error is overruled.

*This Court's Ruling*

The judgments of the trial court are affirmed.


TERRY McCALL
JUSTICE


August 18, 2011

Publish. *See* TEX. R. APP. P. 47.2(b).

Panel consists of: Wright, C.J.,
McCall, J., and Kalenak, J.