

COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

| | | |
|---|---|---|
| DERYL JACKSON, | § | No. 08-22-00009-CR |
| Appellant, | § | Appeal from the |
| v. | § | 85th Judicial District Court |
| THE STATE OF TEXAS, | § | of Brazos County, Texas |
| Appellee. | § | (TC# 19-04458-CRF-85) |

## **O P I N I O N**

The State of Texas charged Appellant, Deryl Jackson, with one count of aggravated assault with a deadly weapon and one count of murder, and the jury found Appellant guilty of the lesser-included offense of manslaughter on the murder charge. Appellant challenges his conviction in two issues, arguing that the trial court abused its discretion by (1) admitting testimony regarding Appellant's commission of an extraneous offense over Appellant's objection under TEX. R. EVID. 403 and (2) admitting a witness's video-recorded interview as a prior consistent statement under TEX. R. EVID. 801(e)(1)(B). For the following reasons, we affirm Appellant's conviction.[1]

---

[1] This case was transferred from our sister court in Waco, and we decide it in accordance with the precedent of that court to the extent required by TEX. R. APP. P. 41.3.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. Factual background

On the afternoon of July 5, 2019, a police dispatcher in Bryan, Texas, received a 911 call reporting that a man had been stabbed. Law enforcement and emergency services responded to a local residence where they found the victim, Jevell Kinney, laying in the front yard of another nearby house. As emergency personnel treated Kinney at the scene, officers spoke to Dresdyn Jackson—Kinney's wife and Appellant's sister. Dresdyn told officers that Kinney was outside the house "high," screaming, and hitting a car that belonged to her sister, Denariss Jackson. Dresdyn further related that when Denariss asked Appellant to get Kinney away, Dresdyn saw Appellant run out of the house with a knife and flee the scene.[2] Paramedics transported Kinney to a hospital where he subsequently died. According to a medical examiner who performed an autopsy, the cause of Kinney's death was from two stab wounds in his chest that were consistent with having been inflicted with a single-edged knife. A toxicology test also showed the presence of phencyclidine (PCP) and ketamine in Kinney's blood at the time of his death.

Detective Candido Amaya of the Bryan Police Department was assigned to investigate the homicide. When he arrived at the scene, Joyce Jackson, the owner of the house, gave Detective Amaya consent to search the house. Inside, officers found a trail of blood droplets on the floor and several items with blood on them; Detective Amaya believed the blood came from Appellant through wounds he sustained while stabbing Kinney. Detective Amaya also spoke with Kinney's

---

[2] At trial, without objection from Appellant, the court admitted a copy of the bodycam recording of Denariss's conversation with officers at the scene.

minor stepson, D.B., and conducted a recorded interview that we recount in detail below.[3] Officers subsequently obtained an arrest warrant for Appellant and began searching for him. Appellant turned himself in to law enforcement five days after the stabbing. When Appellant surrendered himself, an officer observed that Appellant had a large cut on the palm of his hand, which the officer testified was "[v]ery common for suspects to actually get cut themselves during an assault with a knife" because the hand gets slippery to where it continues to travel over the blade.

The State charged Appellant with Kinney's murder, further alleging in the indictment that Appellant was a habitual offender by having previously been finally convicted of (1) possession of a controlled substance with intent to deliver and (2) aggravated assault with a deadly weapon. At trial, the State introduced Detective Amaya's video-recorded interview of D.B. over Appellant's hearsay objection. The State also introduced testimony from Appellant's neighbor, Yolanda Johnson, who testified over Appellant's TEX. R. EVID. 403 objection that Appellant had previously stabbed her boyfriend, Lee Anthony Davis, in 2005. We recount that testimony below.

The jury found Appellant guilty of the lesser-included offense of manslaughter and affirmatively found that Appellant used a deadly weapon (a knife) during the commission of the offense. Having found the State's habitualization allegations true, the jury assessed punishment of sixty years' imprisonment. This appeal followed. Appellant raises two issues challenging his conviction: (1) the trial court abused its discretion by admitting Johnson's testimony that Appellant previously stabbed Davis because the probative value of the testimony was substantially outweighed by the risk of unfair prejudice, thereby violating TEX. R. EVID. 403; and (2) the trial court abused its discretion by admitting the recorded interview of D.B. because the interview did

---

[3] Because D.B. was a minor at the time of trial, we refer to him by his initials in place of his true name. *See* TEX. R. APP. P. 9.10; *see also Fernandez v. State*, 597 S.W.3d 546, 551 n. 4 (Tex. App.—El Paso 2020, pet. ref'd) (using a minor party's initials to protect her identity).

not contain D.B.'s prior consistent statements under TEX. R. EVID. 801(e)(1)(B), thus violating the hearsay rule. We consider each issue in turn.

## II. EXTRANEOUS-OFFENSE EVIDENCE

In his first issue, Appellant argues that the trial court abused its discretion by admitting Johnson's testimony regarding a previous stabbing incident over Appellant's objection under TEX. R. EVID. 403. For the following reasons, we conclude that the trial court did not abuse its discretion by admitting Johnson's testimony.

### A. Factual background

During an admissibility hearing outside the jury's presence, Johnson testified that she knew Appellant as "Hootie." Johnson testified that in 2005, she was in her residence sitting with Davis on a couch when Appellant came through the door without permission, asked where Davis was, and stabbed Davis with a knife. Johnson recounted that she attempted to stop Appellant, but he pushed her down whereupon Davis fled to a bathroom and locked the door. Appellant left when Johnson threatened to call the police. Johnson took Davis to the hospital where they were told the wound was not deep enough for stitches. Appellant was arrested for aggravated assault with a deadly weapon, and Johnson testified at Appellant's trial for that incident.

At the conclusion of the admissibility hearing, defense counsel argued that Johnson's testimony was inadmissible under TEX. R. EVID. 403 because the evidence's probative value was substantially outweighed by the risk of unfair prejudice. The prosecutor responded that Johnson's testimony regarding the stabbing was admissible because it was relevant to rebut Appellant's self-defense theory, which defense counsel raised in both his opening statement and through his cross-examination of witnesses regarding the effects of PCP and Kinney's intoxication on PCP at the time of his death. Defense counsel denied having sufficiently raised a self-defense theory in his

4

opening statement. The State responded that the testimony was also admissible because of the similarity between the Davis and Kinney stabbings. The trial court overruled Appellant's Rule 403 objection and allowed Johnson to testify about the Davis stabbing, but the court issued a verbal limiting instruction to restrict the use of the evidence to a non-character-conformity purpose under TEX. R. EVID. 404(b). The jury charge also contained a similar limiting instruction.

**B. Standard of review and applicable law**

A trial court's admission of extraneous-offense evidence over a Rule 403 objection is reviewed for an abuse of discretion. *De La Paz v. State*, 279 S.W.3d 336, 343 (Tex. Crim. App. 2009). An abuse of discretion is not present where the decision to admit or exclude the evidence is within the "zone of reasonable disagreement." *Montgomery v. State*, 810 S.W.2d 372, 391 (Tex. Crim. App. 1990) (en banc).

Texas Rule of Evidence 403 allows a trial court to exclude otherwise relevant evidence if its probative value is substantially outweighed by one or more of the following: "unfair prejudice, confusing the issues, misleading the jury, undue delay, or needlessly presenting cumulative evidence." TEX. R. EVID. 403. "Rule 403 favors admissibility of relevant evidence, and the presumption is that the relevant evidence will be more probative than prejudicial." *Montgomery*, 810 S.W.2d at 389. In performing a Rule-403 analysis, a court

> must balance (1) the inherent probative force of the proffered item of evidence along with (2) the proponent's need for that evidence against (3) any tendency of the evidence to suggest decision on an improper basis, (4) any tendency of the evidence to confuse or distract the jury from the main issues, (5) any tendency of the evidence to be given undue weight by a jury that has not been equipped to evaluate the probative force of the evidence, and (6) the likelihood that presentation of the evidence will consume an inordinate amount of time or merely repeat evidence already admitted.

*Gigliobianco v. State*, 210 S.W.3d 637, 641–42 (Tex. Crim. App. 2006).

5

Thus, a trial court's determination on the admissibility of extraneous-offense evidence typically falls within the zone of reasonable disagreement if the evidence shows: (1) an extraneous transaction is relevant to a material, non-propensity issue; and (2) the probative value of that evidence is not substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury. *De La Paz*, 279 S.W.3d at 344; *see also* TEX. R. EVID. 404(b)(1)–(2) (evidence of a person's commission of a crime, wrong, or other act is not admissible to prove a person's conformity with his character, but the evidence may be admissible for another purpose, such as proving intent or motive).

**C. The trial court did not abuse its discretion by admitting evidence of the Davis stabbing**

Here, defense counsel did not contest in his opening statement that Kinney had been stabbed to death, but rather argued that Kinney was "high as a kite" on PCP and that people under the influence of PCP are "capable of violence . . . [and] causing serious injury to people." Defense counsel further argued that he expected police officers to testify that people under the influence of PCP "have this exaggerated sense of invulnerability and their strength. They can be dangerous." Defense counsel also alleged that Appellant had been called by Denariss to "handle . . . this situation with Jevell," who was "pounding" on her car. He contended that "[Kinney]—at least in the mind of [Appellant] as he came out of the house—was being abusive and posing a threat not only to his family members and his wife and sister but also [to] the children the State has talked to you about." Finally, defense counsel asserted that the jury "may hear testimony about potential for self-defense."

As such, Appellant's implied theory from the start of the case was that he acted in self-defense when he stabbed Kinney because Kinney posed a threat to Appellant or others due to his

intoxication. Evidence suggesting that Appellant had also stabbed Davis without justification on a prior occasion was highly probative evidence tending to negate his self-defense theory, and the State properly used that evidence to rebut Appellant's theory. *See Render v. State*, 347 S.W.3d 905, 921–22 (Tex. App.—Eastland 2011, pet. ref'd) (where defense counsel raised self-defense in his opening statement, evidence that the defendant previously committed a factually similar assaultive offense against another person was useful to the State and highly probative of whether the defendant was the aggressor in his altercation with the victims of the charged offense); *see also Moses v. State*, 105 S.W.3d 622, 626 (Tex. Crim. App. 2003) (recognizing that rebuttal of a defensive theory is a permissible purpose for which relevant extraneous-offense evidence may be admitted under Rule 404(b)). Moreover, Johnson's testimony that Appellant used a knife to assault Davis was probative because that incident was similar to Appellant's use of a knife against Kinney. *See Render*, 347 S.W.3d at 921–22 (recognizing that the similarity between an extraneous offense and the charged offense rendered the extraneous offense more probative of the defendant's guilt of the charged offense).

Regarding the other *Gigliobianco* factors, the trial court issued both an oral limiting instruction prior to Johnson's testimony and a similar written limiting instruction in the jury charge instructing the jurors not to use the evidence for an inappropriate character-conformity purpose under Rule 404(b). *See id.*; *see also Colburn v. State*, 966 S.W.2d 511, 520 (Tex. Crim. App. 1998) (en banc) (recognizing that absent evidence to the contrary, a reviewing court should presume that the jury followed the trial court's instructions). Moreover, Johnson's testimony was not cumulative of other evidence and did not take an inordinate amount of time to adduce, with the entirety of her testimony before the jury comprising only twelve pages in the reporter's record. *See Render*, 347 S.W.3d at 921 (witness's testimony that did not take a significant amount of time weighed in favor

of the testimony's admission). After balancing the *Gigliobianco* factors, we conclude that the trial court did not abuse its discretion by admitting Johnson's testimony over Appellant's Rule-403 objection.

Accordingly, we overrule Appellant's first issue.

### III. HEARSAY EVIDENCE

In his second issue, Appellant argues that the trial court abused its discretion by admitting Detective Amaya's video-recorded interview of D.B. as a prior consistent statement under TEX. R. EVID. 801(e)(1)(B). For the following reasons, we conclude that the trial court did not abuse its discretion by admitting the interview.

#### A. Factual Background

##### 1. D.B.'s direct-examination testimony

D.B., who was fourteen years old at the time of the offense and sixteen years old at the time of trial, testified that Dresdyn is his mother and Kinney was his stepfather. D.B. further testified as follows. Appellant, whom D.B. called "Hootie," is Dresdyn's brother and D.B.'s uncle. According to D.B., Kinney was "high on PCP all the time" and used that narcotic "[a]lmost on a daily basis." On the day of the offense, D.B. was at his grandmother's house with his family and Kinney. D.B. noticed that Kinney appeared to be "high" and was acting "[c]razy" and "delusional," but he was not physically attacking or threatening any person at the house. Dresdyn and other family members at the house were angry at Kinney because he was high, and D.B.'s aunt (Denariss) got upset when Kinney began hitting her car. As Kinney was hitting the car, Denariss asked Appellant to deal with Kinney. D.B. saw that Appellant was angry at Kinney and he began looking for a weapon to use against Kinney, eventually taking a knife from the kitchen. D.B.'s family was worried about what Appellant was going to do and attempted to hold him back from

8

going outside after Kinney, but Appellant moved past them and began running down the street after Kinney, who had started to walk away. When Appellant caught up to Kinney, Kinney turned around and Appellant stabbed him, causing him to fall to the ground. D.B. did not see that Kinney had a weapon or that he tried to attack Appellant. D.B. recalled giving an interview to Detective Amaya. Following the stabbing, D.B. also spoke to law enforcement and two assistant district attorneys about the incident.

### 2. D.B.'s cross-examination testimony

On cross-examination, defense counsel asked D.B. if he had good relationships with Appellant or Kinney prior to the incident, and D.B. responded that he did not. Defense counsel also asked whether D.B. had refused to appear in court and had been "kind of taken into custody," was then in the custody of a relative, and was currently wearing an ankle monitor. D.B. responded to these questions in the affirmative. The defense also asked if D.B. was aware that because his mother had also refused to appear in court, law enforcement had "kicked down her door and took her into custody and she's sitting in jail right now," and D.B. again responded in the affirmative.[4] Defense counsel next asked if D.B. had provided interview statements that had differed from his testimony, and D.B. denied having done so. Defense counsel asked if the prosecutors and officers had pressured him, and D.B. replied that they had "a little bit." Defense counsel asked D.B. if he was "nervous about what the State can do" in light of his mother's arrest and his custody status, or if he testified in a manner displeasing to the State, but D.B. replied that he was not nervous. Although D.B. agreed that he did not tell Detective Amaya everything he had told the jury, D.B. explained that his testimony differed from his interview statements because Detective Amaya "didn't ask the type of questions that the jury [sic] asked." On redirect examination, D.B. admitted

---

[4] At the time of trial, law enforcement had taken Dresdyn into custody pursuant to the trial court's writ of attachment.

that he was not entirely truthful with the prosecutor because some members of his family did not want him speaking to law enforcement about the incident.

### 3. D.B.'s statements within the recorded interview

During the State's case-in-chief, Detective Amaya testified that he spoke to D.B. and his grandmother, Joyce Jackson, while he was at the scene of the stabbing. After getting permission from Dresdyn to speak with D.B., Detective Amaya interviewed D.B. in Amaya's vehicle and recorded the interview with his bodycam. When the State attempted to ask Detective Amaya about what D.B. said during the interview, Appellant made a hearsay objection. The State responded that the interview was admissible as a prior consistent statement under TEX. R. EVID. 801(e)(1)(b) to rebut Appellant's implied charge that D.B. had fabricated his testimony or testified from an improper influence or motive. After reviewing the contents of the interview, the trial court overruled Appellant's objection and admitted the interview, reasoning that it was admissible to rebut defense counsel's questioning that D.B.'s testimony was false because he was afraid of a negative reaction from the State if he did not testify favorably to the State's case. The State subsequently played the interview before the jury.

The following is the relevant portion of the conversation between Detective Amaya and D.B.:

Detective Amaya: Tell me what happened out here.

D.B.: Um, so my uncle was in the house.

Detective Amaya: Who's your uncle?

D.B.: Hootie. Well, Deryl Jackson.

Detective Amaya: Deryl Jackson?

D.B.: Yeah.

10

Detective Amaya: Okay.

D.B.: He was up in the house looking for a knife. Because my stepdad, he was high. Um . . . my uncle was looking for a bat or something to hit him with.

Detective Amaya: Mmhmm.

D.B.: And then, um, he grabbed the knife and he ran and then my um . . . my auntie, my two aunties, my grandma and my mom was trying to stop him.

Detective Amaya: Stop who?

D.B.: My uncle.

Detective Amaya: Deryl?

D.B.: Yeah.

Detective Amaya: Okay.

D.B.: Well, he ran over there [and] he started, he attacked my stepdad. He started stabbing him.

Detective Amaya: Did you see it?

D.B.: Yeah. And then they told me to go up into the house and then I didn't see nothing else.

Detective Amaya: Where did your uncle go?

D.B.: I don't know.

Detective Amaya: Did you see him run away?

D.B.: [Shakes head no]. I wasn't outside.

Detective Amaya: Oh, that's right.

D.B.: They told me to go back up to the house.

Detective Amaya: So you were out here whenever your uncle was in the house looking for a bat?

D.B.: Yeah.

Detective Amaya: Okay. Did you see if . . . were you in the house did you see him looking for a bat?

D.B.: [Nods] Mmhmm.

Detective Amaya: Okay. What was he saying, was he saying anything whenever he was looking for that bat?

D.B.: He said, "I'm tired of him coming over here high and stuff." Then he got real mad.

Detective Amaya: Whenever uh, just use your words, I know sometimes kids don't like to talk curse in front of adults or whatnot, but if whatever he said do it as accurate as you can tell me that would be great. So you said that he was, he was tired of him coming over here.

D.B.: He said, "I'm tired of this bitch-ass nigga coming over here."

Detective Amaya: Okay.

D.B.: Um, "Coming over here high and y'all always put me in it." That's what he said.

Detective Amaya: Then what, what did he do then?

D.B.: He went to grab the knife and ran outside and chased him down.

Detective Amaya: Where did he, where he grab the knife from?

D.B.: The kitchen.

Detective Amaya: Did you see the knife?

D.B.: [Nods] Mmhmm.

Detective Amaya: Uh, what did it look like?

D.B.: It's, . . . it has a black handle that's silver and big.

Detective Amaya: Black handle, silver and big. About how big do you think it was?

D.B.: I really don't know about [indicates distance using his right index finger on top and left index finger on bottom]. It's real big, it's like that [indicating distance] and it's like that.

12

Detective Amaya: Okay. Okay. The handle was about like that [indicating distance]?

D.B.: The handle was small, [unintelligible] small.

Detective Amaya: Okay. So, where, whenever your uncle came out of the house with the knife, where was Deryl?

D.B.: Um, I don't get what you are saying? What do you mean?

Detective Amaya: Your uncle said . . . I'm sorry. Whenever Deryl, your Uncle Deryl came out of the house, where was your stepdad?

D.B.: Oh, he was over there [pointing]. He was like next door on the sidewalk on the street.

Detective Amaya: So, did you see your uncle run toward your stepdad or walk towards him?

D.B.: Yeah. I seen him run.

Detective Amaya: What was he saying whenever he was running?

D.B.: He was just running.

Detective Amaya: What did you see?

D.B.: Crazy.

Detective Amaya: What did you see whenever he got up to … ?

D.B.: He started stabbing him.

Detective Amaya: Did he say anything? Did you hear him say anything?

D.B.: [Shakes head side to side] Uh-uh. I was like, I was right there [indicating].

Detective Amaya: How did he . . . Say this is the knife [Amaya hands pen to D.B.]. How did you see him stab him?

D.B.: [holds pen in right hand and makes several downward stabbing motions]

Detective Amaya: Was he like on top of him?

13

D.B.: Yeah.

Detective Amaya: Or . . .

D.B.: He was like trying to push him down because he kept trying to get up and fight.

Detective Amaya: Okay. Think he just did, did like that. [making stabbing motion]

D.B.: Yeah.

Detective Amaya: How many times . . .

D.B.: Side [indicating where stabbed] and [indicating]. Inside a bunch of times. And then he stabbed him right here [indicating]. And that's all I saw. I didn't see nothing else.

Detective Amaya: Okay. And that's when they told you to go in.

D.B.: Yeah.

Detective Amaya: Okay. Alright. D.B., I appreciate you talking to me. Okay buddy?

D.B.: [Nods].

Detective Amaya: Alright, Alright. Um, you can go ahead and step out, okay? Thank you, sir.

**B. Standard of review and applicable law**

A trial court's admission of a prior consistent statement under Rule 801(e)(1)(B) is reviewed under the same abuse-of-discretion standard set forth above. *Hammons v. State*, 239 S.W.3d 798, 806 (Tex. Crim. App. 2007). Hearsay is a statement a declarant makes outside of his testimony at the current proceeding that a party offers in evidence to prove the truth of the matter asserted. TEX. R. EVID. 801(d). Absent an exclusion or exception to the rule, hearsay is not admissible. TEX. R. EVID. 802. Relevant here, Rule 801(e)(1)(B) excludes from hearsay and allows admissibility when

> [t]he declarant testifies and is subject to cross-examination about a prior statement, and the statement . . . is consistent with the declarant's testimony and is offered to rebut an express or implied charge that the declarant recently fabricated it or acted from a recent improper influence or motive in so testifying.

TEX. R. EVID. 801(e)(1)(B). Thus, a proponent must demonstrate that a statement meets four requirements for such testimony to be admissible:

(1) the declarant must testify at trial and be subject to cross-examination;

(2) there must be an express or implied charge of recent fabrication or improper influence or motive of the declarant's testimony by the opponent;

(3) the proponent must offer a prior statement that is consistent with the declarant's challenged in-court testimony; and

(4) the prior consistent statement must be made prior to the time that the supposed motive to falsify arose.

*Hammons*, 239 S.W.3d at 804. If a statement satisfies these requirements, it is admissible as substantive, non-hearsay evidence. *Id.*

### C. D.B.'s interview statement was generally consistent with his testimony

Appellant's briefing only challenges the State's satisfaction of the third requirement in Rule 801(e)(1)(B), i.e., that D.B.'s prior statement given in his interview was consistent with his trial testimony. The Court of Criminal Appeals has recognized that a declarant's prior statement must only be "generally consistent" with the declarant's trial testimony. *Hammons*, 239 S.W.3d at 805 (citations omitted). To that end, although a witness's trial testimony may include or exclude some details provided in a prior statement, the two accounts will nonetheless still be "generally consistent" with each other for the purposes of Rule 801(e)(1)(B) if the earlier statement does not differ in relevant substance with the in-court testimony. *See Dibello v. State*, 432 S.W.3d 913, 915 (Tex. App.—Houston [1st Dist.] 2014, pet. ref'd).

15

Here, D.B.'s statements to Detective Amaya were generally consistent with his trial testimony in terms of the critical details. D.B. told Detective Amaya during the interview: (1) on the night he was stabbed, Kinney was under the influence of narcotics; (2) Appellant was in the house with the rest of the family; (3) Appellant got angry at Kinney and grabbed a knife from the kitchen; (4) Appellant's family tried to stop Appellant from going outside, but failed; and (5) Appellant went outside, pursued Kinney, and stabbed him. Likewise, D.B. testified at trial: (1) Kinney was under the influence of narcotics and was outside hitting Dresdyn's car; (2) the family asked Appellant to deal with Kinney; and (3) Appellant was angry and retrieved a knife from the kitchen; (4) Appellant's family tried but failed to stop Appellant; and (5) Appellant went outside, chased Kinney down, and stabbed him.

Although D.B. did not mention in his interview the details that he was outside the house at the time of the stabbing, that Kinney was pounding on a car, or that children were outside when Appellant stabbed Kinney, D.B.'s interview statements were generally consistent with his testimony. Moreover, D.B. provided a reason for including these details in his testimony but not in his interview: the attorneys at trial asked different questions than Detective Amaya asked during the interview. Because D.B.'s interview statements and trial testimony were generally consistent, we hold that the trial court did not abuse its discretion by admitting D.B.'s interview statement under Rule 801(e)(1)(B). *See Hammons*, 239 S.W.3d at 805; *see also Dibello*, 432 S.W.3d at 915 (holding that a witness's pretrial interview statements and trial testimony were sufficiently consistent with each other under Rule 801(e)(1)(B), despite the fact that the witness provided details of the crime during his trial testimony that he did not give in his interview, because the two accounts "did not differ in relevant substance").

Accordingly, we overrule Appellant's second issue.

16

## IV. CONCLUSION

We affirm the trial court's judgment supporting Appellant's conviction.

LISA J. SOTO, Justice

February 27, 2023

Before Rodriguez, C.J., Palafox, and Soto, JJ.

(Do Not Publish)